# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

|  |  |
|---|---|
| BITMAN TECHNOLOGIES GEORGIA LIMITED, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No.: |
| JWKJ TECHNOLOGIES LLC, | ) ) ) |
| Defendant. | ) ) ) |

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, DECLARATORY JUDGMENT, AND DAMAGES**

Plaintiff Bitmain Technologies Georgia Limited ("Bitmain" or "Plaintiff") hereby brings this action for a Temporary Restraining Order, Preliminary Injunction, Declaratory Judgment, and Damages against Defendant JWKJ Technologies LLC ("JWKJ"), and alleges:

**PARTIES**

1. Bitmain is a corporation incorporated under the laws of the State of Georgia, having its registered office at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076.

2. JWKJ is a Florida Limited Liability Company, having its principal place of business at 7901 4th St. N, Ste. 300, St. Petersburg, FL 33702. It maintains a principal address of 4350 Semple Ave., Saint Louis, MO 01321. Upon information and belief, no members of JWKJ are citizens of Georgia.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Bitmain and JWKJ, and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

4. The Court has personal jurisdiction over JWKJ pursuant to Mo. Rev. Stat. § 506.500.1(1)-(3) because it transacts business within Missouri and has sufficient minimum contacts with Missouri to satisfy any due process concerns.

5. JWKJ owns the facility located at 4350 Semple Avenue, St. Louis, Missouri, 63210, which is site of the dispute between the parties.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as this is the district in which most of the acts giving rise to this action occurred, and in which property at issue is located.

## BACKGROUND

7. JWKJ refuses to return approximately $15 million worth of Bitmain's property it does not own and has no right to hold.

8. In 2023, Bitmain engaged JWKJ to operate a data center hosting 6,000 of Bitmain bitcoin mining servers (the "Hosted Servers"), specialized electronic devices used to generate revenue for Bitmain by validating bitcoin transactions. Bitmain relied on JWKJ to provide a facility suitable to house the Hosted Servers, which require constant access to electrical power and the internet to operate. Bitmain expected to receive the rewards from any bitcoin that the Hosted Servers successfully mined, and in return, Bitmain paid JWKJ a hosting fee.

9. Bitmain operated the Hosted Servers at JWKJ's facility located at 4350 Semple Avenue, St. Louis, MO 63210 until June 2024, when JWKJ abruptly locked Bitmain personnel out

of the Data Center Facility, breaching its obligations under the Service Framework Agreement (the "SFA") that governs the relationship between Bitmain and JWKJ.

10. From February 2024 to June 2024, JWKJ did not maintain stable electric power and internet access sufficient to allow Bitmain to use the Hosted Servers to mine bitcoin, in violation of the SFA. Bitmain has reason to believe that on June 16, 2024, JWKJ manipulated the Hosted Servers so that their computational power was directed towards a mining pool with rewards for JWKJ, not the mining pool as designated by Bitmain for which JWKJ was contractually obligated to direct the Hosted Servers. This caused JWKJ to reap the rewards of the Hosted Servers' work, which it continues to do today.

11. In all, as of June 30, 2024, JWKJ has stolen more than 5.59 bitcoin from Bitmain through this scheme, worth approximately $356,882.69 at the time of the theft, and JWKJ continues to steal approximately 0.37 bitcoin every day the Hosted Servers are on-line and directed towards mining pool as designated by JWKJ.

12. Due to JWKJ's severe breaches of the SFA, on June 20, 2024, Bitmain terminated the agreement and demanded that JWKJ allow Bitmain to enter the Data Center Facility to retrieve its property, as is its right under the SFA. JWKJ refuses and is unlawfully detaining Bitmain's property worth approximately $15 million at the Data Center Facility all the while using Bitmain's property to enrich itself. This injustice must end.

**ALLEGATIONS**

**A.    Bitcoin Mining**

13. Bitcoin is a crypto-asset that uses cryptographic principles to allow owners of bitcoin to securely transact with each other and to prove ownership of bitcoin via the bitcoin blockchain, a decentralized public ledger.

14. No single organization controls bitcoin. Rather, the bitcoin crypto-protocol maintains the bitcoin blockchain and provides for new bitcoins to enter the economy through a mechanism known as "mining." Individuals "mine" bitcoin by using sophisticated computer programs to perform complex, resource-intensive computations which validate past bitcoin transactions. Once the transactions are validated, they are added to the bitcoin blockchain.

15. The mining process is competitive. The first miner to validate a block of transactions is rewarded with an amount of bitcoin, while other miners get nothing for that block. Blocks are mined on average once every ten minutes. The current reward for validating a block of transactions is 3.125 bitcoin. Bitcoin miners can either sell the bitcoin for a fiat currency, such as U.S. dollars, or hold the bitcoin as an investment. At the current price of bitcoin, the reward for mining a single block of bitcoin is worth approximately $180,000.

16. Because the computations required to mine bitcoin are highly complex, miners typically use machines equipped with application-specific integrated circuit ("ASIC") chips to stay competitive. These machines are custom-built to efficiently mine bitcoin and can cost thousands of dollars. To increase their profitability, miners often operate hundreds or even thousands of ASIC mining servers at a time in a "mining pool." If the mining pool is successful and receives a reward, that reward is divided among participants in the pool based on the computing power that each participant provides to the mining pool.

17. Bitcoin mining, especially at a commercial scale, consumes significant amounts of electric power. Without a reliable source of electric power, ASIC miners cannot be put to a productive use.

18. ASIC miners are sophisticated electronic devices. As such, they are vulnerable to damage from a variety of sources, such as water and moisture, heat, dust and debris, static electricity,

and physical injury. To mitigate the risk of damage, ASIC miners are typically stored in secured, climate-controlled data centers.

19. Bitmain is an industry-leading developer and manufacturer of high-quality ASIC miners. Although Bitmain frequently sells ASIC miners to individuals and organizations seeking to mine bitcoin, it also uses its own ASIC miners to mine bitcoin itself.

**B.     Bitmain Enters into the Service Framework Agreement with JWKJ.**

20. On March 1, 2023, Bitmain and JWKJ entered into the SFA, under which JWKJ agreed to provision the Data Center Facility, a facility at which Bitmain mined bitcoin using the Hosted Servers: 6,000 ASIC miners with a model number of S19XP.

21. A true and accurate copy of the SFA is attached hereto as <u>Exhibit A</u>.

22. The Hosted Servers must be connected to electric power and to the internet to operate productively. It therefore was critical to Bitmain in executing the SFA that JWKJ be able to provide constant flow of sufficient power to the Data Center Facility. Accordingly, Article 6.1 of the SFA required JWKJ to "provide Bitmain with sufficient . . . power load and facilities . . . reasonably required for the normal operation of the Hosted Servers."

23. Because it was important to Bitmain that the Hosted Servers be productively running as much as possible, the SFA required JWKJ to keep the Hosted Servers on-line on the monitoring software and contributing its computational power to the mining pool as designated by Bitmain at least 95% of the time, on average. To measure this, the SFA defined "Online Status Ratio" as follows:

> "Online Status Ratio" means a fraction where the numerator is the sum of the actual length of time of each Hosted Server in Online Status during the applicable Billing Period, and the denominator is the product of the Hosting Quantity of Hosted Servers and the theoretical length of time of each Hosted Server in Online Status during the applicable Billing Period.

Ex. A, SFA, Article 1.1, at p. 5.

5

24. Article 6.9(a) of the SFA requires JWKJ to maintain an Online Status Ratio of at least 95%.

25. If the Online Status Ratio drops below 95%, JWKJ is given one month under the SFA to remedy the situation, after which Bitmain may "terminate this Agreement with immediate effect without any liability for breach of contract." Ex. A, SFA, Article 6.9(b-c), at p. 19.

26. Under Article 8.1 of the SFA, Bitmain, not JWKJ, owns the Hosted Servers:

> "Ownership of Hosted Servers. Subject to Articles 8.2 and 8.3, Service Provider acknowledges and agrees that the Hosted Servers and Inventory Assets are assets of BITMAIN or any third party designated by BITMAIN (as applicable) (collectively, the "Owner of Hosted Servers") and the Owner of Hosted Servers shall solely have the proprietary interest in the Hosted Servers. The Owner of the Hosted Servers' such interest shall not be affected by any factors, including but not limited to Service Provider's operating conditions, financial conditions or any disputes or lawsuits against its shareholders or any third parties. In no event shall Service Provider's creditors, shareholders or other third parties be entitled to file disputes regarding the ownership of the Owner of Hosted Servers. Without prejudice to the foregoing, in the event that any such dispute occurs, Service Provider shall provide the Owner of Hosted Servers with all reasonable assistance in proving the Owner of Hosted Servers' proprietary interest in the Hosted Servers."

SFA, Article 8.1, at p. 20.

27. In May 2024, since JWKJ was unable to provide sufficient power supply, by agreement between Bitmain and JWKJ, the parties reduced the total hosting quantity to 3,429 Hosted Servers. With 22 Hosted Servers currently at Bitmain's repair outlets, there are 3,407 Hosted Servers currently under JWKJ's control. The 3,407 remaining Hosted Servers have a retail value of approximately $15 million and are capable of generating approximately 0.37 bitcoin per day based on current network capability, a current value of approximately $21,100.

28. A list of the serial numbers of the Hosted Servers is attached hereto as Exhibit B.

29. It was important to Bitmain that Bitmain's personnel have unfettered access to the Data Center Facility to, among other things, ensure the safety and security of Bitmain's valuable

6

property.  Accordingly, the SFA provides that JWKJ shall not restrict Bitmain's access to the Data Center Facility:

> "Service Provider shall provide all necessary support and cooperation for the operation and maintenance of the Hosted Servers by BITMAIN Personnel, including but not limited to that Service Provider shall grant BITMAIN Personnel access and permit to:
>
> (a) enter into the Data Center Facility;
>
> (b) obtain the operational data of the Hosted Servers;
>
> (c) inspect the operational conditions of the Data Center Facility;
>
> (d) perform maintenance on the Hosted Servers;
>
> (e) handle or repair any Hosted Servers that may be damaged, defective, malfunctioning or not operating; and
>
> (f) check, examine and conduct inventory audits of the Hosted Servers and Inventory Assets."

Ex. A, SFA, Article 6.7, at p. 18.

30. In exchange for providing a secure facility with constant access to electric power and the internet in which Bitmain could use its Hosted Servers to mine bitcoin, Bitmain paid JWKJ a monthly hosting service fee.

31. From March 2023 through June 2024, Bitmain operated the Hosted Servers to mine bitcoin at the Data Center Facility.

**C.     JWKJ Breaches the Service Framework Agreement—and Steals Bitmain's Bitcoin.**

32. However, in June 2023, JWKJ began to repeatedly breach the SFA, which breaches continue unabated to this day.

33. From June 2023 through October 2023 and from February 2024 through June 2024, JWKJ maintained the Online Status Ratio of the Hosted Servers below 95%.  By maintaining the Online Status Ratio below 95%, JWKJ breached Article 6.1 of the SFA, which requires JWKJ to "provide Bitmain with sufficient . . . power load and facilities . . . reasonably required for the normal

7

operation of the Hosted Servers," Ex. A, SFA at pp. 15-16, and Article 6.9 of the SFA, which requires JWKJ to "ensure that the Online Status Ratio in each Billing Period is no less than 95%," *id.* at p. 19.

34. Most nefariously, beginning on June 16, 2024, local time, JWKJ reconfigured and manipulated the Hosted Servers without Bitmain's authorization to divert the computational power of the Hosted Servers away from the mining pool as configured and designated by Bitmain and into another mining pool with rewards for JWKJ. Instead of generating bitcoin mining rewards for Bitmain, as provided under the SFA, JWKJ used the Hosted Servers to generate bitcoin mining rewards for JWKJ. In doing so, as of June 30, 2024, JWKJ took possession of over 5.59 bitcoin that lawfully should belong to Bitmain, property worth approximately $356,000 at the time of the theft.

35. JWKJ's redirection of the Hosted Servers constitutes a severe and continuous breach of the SFA.

36. Moreover, since June 2024, JWKJ has prevented Bitmain personnel from accessing the Data Center Facility. In doing so, JWKJ breached Article 6.7 of the Agreement, which requires JWKJ to "provide all necessary support and cooperation for the operation and maintenance of the Hosted Servers by Bitmain Personnel" and requires JWKJ to "grant Bitmain Personnel access and permit to enter into the Data Center Facility."

37. Furthermore, JWKJ's conduct constitutes tortious conversion, violating Article 6.6 of the SFA, which requires JWKJ to "ensure that the operation of the Data Center Facility, the individuals of Service Provider and provision of Service is at all times in compliance with Applicable Laws."

**D.  Bitmain Terminates the SFA.**

38. After JWKJ allowed the Online Status Ratio to drop below 95%, breaching its obligations under the SFA, Bitmain proactively engaged in discussions with JWKJ beginning during

April 2024 and continuing through June 2024 regarding the Online Status Ratio. However, JWKJ has failed to remedy its continuing breaches of the SFA and has allowed the Online Status Ratio to continue to fall below 95%.

39.     Moreover, as of June 30, 2024, JWKJ has stolen over 5.59 of Bitmain's bitcoin, worth approximately $356,000 at the time of the theft, by redirecting the computational power for Bitmain's Hosted Servers.

40.     Due to JWKJ's continued and unremedied breaches of the Agreement, on June 19, 2024, Bitmain notified JWKJ in writing that it was exercising its right to terminate the SFA, under, inter alia, Article 11.2(d) of the SFA, which provides:

> This Agreement may be terminated prior to the expiration of the Term . . . upon BITMAIN giving a written notice to Service Provider to terminate pursuant to Article 3.4(d)(iii), Article 6.9(c), Article 9.1, Article 15.3 or other applicable articles if the situation has not been improved after negotiation between the Parties . . . ."

Ex. A, SFA, Article 11.2, at pp. 22-23.

41.     A true and correct copy of the written notification terminating the Agreement is attached hereto as Exhibit C.

42.     Upon termination of the SFA, JWKJ was required to "provide unfettered access to BITMAIN Personnel to the Data Center Facility and any assistance required by such BITMAIN Personnel to remove the BITMAIN Property," which includes the Hosted Servers. Ex. A, SFA Article 11.3(a)(iv).

43.     Notably, under Article 13.1 of the SFA, JWKJ acknowledged that a breach or threatened breach of the SFA would "cause serious and irreparable harm to BITMAIN for which monetary damages alone would not be a sufficient remedy." Moreover, JWKJ agreed that in the event of a breach, Bitmain would be "entitled to injunctive relief . . . ." Indeed, according to Article 13.1 of the SFA:

9

> **13. INJUNCTIVE RELIEF**
>
> 13.1. Service Provider acknowledge that a breach or threatened breach of this Agreement shall cause serious and irreparable harm to BITMAIN for which monetary damages alone would not be a sufficient remedy. Accordingly, Service Provider agrees that in the event of a breach or threatened breach by the Service Provider, BITMAIN shall be entitled to injunctive relief and specific performance in addition to any other remedy available to BITMAIN in equity or at law without the necessity of obtaining any form of bond or undertaking whatsoever, and Service Provider hereby waives any claim or defense that damages may be adequate or ascertainable or otherwise preclude injunctive relief.

Ex. A, SFA, Article 13.1, at p. 25.

44. Bitmain has demanded that JWKJ allow Bitmain access to the Data Center Facility to recover Bitmain's property, including the Hosted Servers. *See* Ex. C. JWKJ has refused to provide Bitmain such access.

45. Accordingly, JWKJ is unlawfully detaining Bitmain's Hosted Servers at the Data Center Facility and has converted Bitmain's property to its own use.

**E.      JWKJ's Actions Expose Bitmain's Property to the Risk of Irreparable Harm.**

46. The Hosted Servers are sophisticated electronic devices that are vulnerable to damage from a variety of sources, including water and moisture, temperature fluctuations, dust and debris, static electricity, and physical injury.

47. The model line for the Hosted Servers, S19XP, is no longer in production, meaning that Bitmain cannot replace any lost Hosted Servers with equivalent property.

48. By refusing to allow Bitmain to remove the Hosted Servers from the Data Center Facility, JWKJ is preventing Bitmain from mitigating the risk of damage arising from their storage in a potentially unsuitable location and is responsible for any damage to the Hosted Servers resulting from the current condition of the Data Center Facility.

49. In addition, the Hosted Servers are depreciating while in JWKJ's possession, reducing the amount that Bitmain may receive if it sells the Hosted Servers after regaining possession thereof.

50. Moreover, while the Hosted Servers are unlawfully detained at the Data Center Facility, they are exposed to the risk of theft or damage by third parties, which would irreparably harm the Hosted Servers.

## **COUNT I – DECLARATORY JUDGMENT**

51. Bitmain incorporates the allegations of Paragraphs 1 through 52 above herein by reference.

52. Bitmain is the lawful owner of the Hosted Servers, which are, upon information and belief, currently located at the Data Center Facility.

53. JWKJ currently controls access to the Data Center Facility.

54. Although the SFA provides that JWKJ must allow Bitmain unfettered access to the Data Center Facility to retrieve Bitmain's property, including the Hosted Servers, in the event of termination of the Agreement, JWKJ is wrongfully refusing to allow Bitmain to enter the Data Center Facility.

55. By denying Bitmain access to the Data Center Facility to retrieve Bitmain's property, JWKJ has also implicitly disputed Bitmain's ownership of the Hosted Servers.

56. Bitmain has been and will be irreparably harmed if such breaches continue. Accordingly, Bitmain is entitled to declaratory relief to enforce those rights.

57. Bitmain is entitled to a judgment that Bitmain is the owner of the Hosted Servers and is entitled to unfettered access to the Data Center Facility so that Bitmain may remove Bitmain's Hosted Servers, which JWKJ is unlawfully detaining therein.

58. All conditions precedent have been performed or have occurred for Bitmain to be entitled to declaratory judgment.

## COUNT II – BREACH OF CONTRACT

59. Bitmain incorporates the allegations of Paragraphs 1 through 60 above herein by reference.

60. On March 1, 2023, Bitmain and JWKJ entered into the SFA.

61. The SFA is a valid and enforceable contract.

62. Bitmain fully performed its obligations under the SFA.

63. JWKJ has materially breached its obligations under the SFA by, among other things:

   a. Maintaining the Online Status Ratio of the Hosted Servers below 95% from June 2023 to October 2023 and then from February 2024 to June 2024;

   b. Refusing Bitmain unfettered access to the Data Center Facility;

   c. Implicitly disputing Bitmain's ownership of the Hosted Servers; and

   d. Redirecting the mining pool of the Hosted Servers to generate bitcoin mining rewards for JWKJ.

64. As a direct and proximate result of JWKJ's breaches, Bitmain has suffered irreparable harm, along with compensatory and other damages.

## COUNT III – CONVERSION

65. Bitmain incorporates the allegations of Paragraphs 1 through 66 above herein by reference.

66. Bitmain is the lawful owner of the Hosted Servers, tangible property which is, upon information and belief, currently located at the Data Center Facility.

67. JWKJ currently controls access to the Data Center Facility.

68. Bitmain has demanded that JWKJ return the Hosted Servers or, in the alternative, allow it to enter the Data Center Facility to take possession of the Hosted Servers.

69. JWKJ is aware that Bitmain is the lawful owner of the Hosted Servers but willfully and in bad faith refuses to return the Hosted Servers or allow Bitmain access to the Data Center Facility to take possession of the Hosted Servers.

70. By refusing to return the Hosted Servers or allow Bitmain access to the Data Center Facility to take possession of the Hosted Servers, JWKJ has prevented Bitmain from exercising its right of ownership over the Hosted Servers.

71. JWKJ has also prevented Bitmain from exercising its right of ownership over the Hosted Servers by redirecting the computational power for the Hosted Servers so that bitcoin mining rewards generated by the Hosted Servers since June 16, 2024 have gone to a mining pool with rewards for JWKJ or an JWKJ affiliate, not in Bitmain's designated mining pool, as provided under the SFA.

72. JWKJ has converted Bitmain's property, and Bitmain is entitled to a judgment awarding it the value of the Hosted Servers, lost profits from Bitmain's inability to put the Hosted Servers to a productive use while those Hosted Servers are unlawfully detained at JWKJ's facility, return of any bitcoin JWKJ mined while the computational power for Bitmain's Hosted Servers was redirected to a mining pool with rewards for JWKJ or an JWKJ affiliate, and any other relief that the Court may deem just, equitable, and proper.

73. All conditions precedent have been performed or have occurred for Bitmain to recover from JWKJ for conversion.

### COUNT IV – TAMPERING WITH COMPUTER DATA
### (MO. REV. STAT. § 569.095, *et seq.*)

74. Bitmain incorporates the allegations of Paragraphs 1 through 75 above herein by reference.

75. JWKJ violated the Missouri Tampering with Computer Data statute, Mo. Rev. Stat. § 569.095, *et seq.*, and Bitmain was injured as a result of JWKJ's violation.

13

76. JWKJ violated the Missouri Tampering with Computer Data statute by knowingly, and without authorization or reasonable grounds to believe that it has such authorization, accessing Bitmain's computers, computer system, and computer network without Bitmain's authorization and without reasonable grounds.

77. Furthermore, JWKJ violated the Missouri Tampering with Computer Data statute by knowingly, and without authorization or reasonable grounds to believe that it has such authorization, modifying programs residing or existing internal to a computer, computer system, and computer network.

78. JWKJ violated the Missouri Tampering with Computer Data statute by retaining data it knows was obtained in violation of this statute.

79. All conditions precedent have been performed or have occurred for Bitmain to recover from JWKJ under the Missouri Tampering with Computer Data statute.

## COUNT V – MISSOURI UNIFORM TRADE SECRETS ACT
### (MO. REV. STAT. § 417.450, *et seq.*)

80. Bitmain incorporates the allegations of Paragraphs 1 through 81 above herein by reference.

81. To mine Bitcoin, Bitmain uses information, including programs, devices, methods, techniques, processes, and financial data, that derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

82. Bitmain's information, including programs, devices, methods, techniques, processes, and financial data, is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

83. Bitmain's information, including programs, devices, methods, techniques, processes, and financial data, constitutes trade secrets.

84. JWKJ acquired Bitmain's trade secrets without Bitmain's consent, and JWKJ knew or had reason to know that Bitmain's trade secrets were acquired by improper means.

85. JWKJ used Bitmain's trade secrets without Bitmain's consent, and JWKJ used improper means to acquire knowledge of Bitmain's trade secrets.

86. JWKJ used Bitmain's trade secrets without Bitmain's consent, and at the time of use, JWKJ knew or had reason to know that its knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it.

87. JWKJ used Bitmain's trade secrets without Bitmain's consent, and at the time of use, JWKJ knew or had reason to know that its knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

88. JWKJ used Bitmain's trade secrets without Bitmain's consent, and at the time of use, JWKJ knew or had reason to know that its knowledge of the trade secret was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

89. Bitmain has been injured by JWKJ's misappropriation of Bitmain's trade secrets.

90. All conditions precedent have been performed or have occurred for Bitmain to recover from JWKJ under the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. § 417.450, *et seq*.

## ATTORNEY'S FEES

91. Bitmain adopts by reference the allegations set forth in each of the preceding paragraphs of this petition.

92. Bitmain seeks to recover its attorney's fees from JWKJ. Recovery of attorney's fees is authorized under the Missouri Uniform Trade Secrets Act and the Missouri Tampering with Computer Data statute. Accordingly, Bitmain further sues for reasonable attorneys' fees, including fees for any appeal, insomuch as Bitmain has been required to employ the undersigned attorneys to file suit and have agreed to pay them reasonable attorneys' fees for their services.

93. Furthermore, Bitmain seeks to recover its attorney's fees from JWKJ under the SFA, which provides that "[t]he breaching Party shall bear the attorney fees . . . of the non-breaching Party." Ex. A, SFA, Article 16.4, at p. 27.

94. Bitmain seeks recovery of attorney's fees under any other applicable law.

95. Bitmain seeks recovery of all costs incurred herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Bitmain respectfully requests that the Court grant the following relief:

A. Judgment declaring Bitmain the owner of the Hosted Servers; and

B. Injunctive relief in the form of a temporary restraining order, temporary injunction, and permanent injunction enjoining and prohibiting JWKJ from preventing Bitmain from entering the Data Center Facility for the purpose of removing the Hosted Servers; and

C. Injunctive relief in the form of a temporary restraining order, temporary injunction, and permanent injunction enjoining and prohibiting JWKJ from continuing to use the Hosted Servers to mine bitcoin while the computational power for the Hosted Servers is directed to a mining pool with rewards for JWKJ or any affiliated entity; and

D. Injunctive relief in the form of a temporary restraining order, temporary injunction, and permanent injunction enjoining and prohibiting JWKJ from selling or otherwise disposing of the Hosted Servers; and

E. Injunctive relief in the form of a temporary restraining order, temporary injunction, and permanent injunction enjoining and prohibiting JWKJ from selling or otherwise disposing of any bitcoin JWKJ mined while the computational power for the Hosted Servers was directed to a mining pool with rewards for JWKJ or any affiliated entity.

F. Judgment against JWKJ for actual, incidental, compensatory, consequential, and punitive damages in an amount to be proven at trial, plus costs, interest, and reasonable attorneys' fees; and

G. A jury trial to determine the actual, incidental, compensatory, consequential, and punitive damages, plus costs, interest, and reasonable attorneys' fees.

H. Judgment against JWKJ awarding Bitmain possession of the bitcoin that JWKJ mined using Bitmain's Hosted Servers; and

I. Judgment awarding Bitmain its costs, including reasonable attorney's fees, incurred in bringing this action; and

J. Judgment awarding Bitmain pre- and post-judgment interest; and

K. Such other and further relief as the Court may deem just, equitable, and proper.

Respectfully submitted,

SHANK & HEINEMANN, LLC

By: */s/ Christopher S. Shank*
Christopher S. Shank, MO Bar # 28760
1968 Shawnee Mission Parkway, Suite 100
Mission Woods, KS 66205
Telephone: 816-471-0909
Fax:     816-471-3888
chris@shanklawfirm.com

Matthew G. Lindenbaum (*Pro Hac Vice motion forthcoming*)
NELSON MULLINS RILEY & SCARBOROUGH LLP
One Financial Center, Suite 3500
Boston, MA 02111
Telephone: 617.217.4700
Facsimile:  617.217.4710
Matthew.Lindenbaum@nelsonmullins.com

*Attorneys for Plaintiff*
*Bitmain Technologies Georgia Limited*