# BITMAIN

v5.3

## SERVICE FRAMEWORK AGREEMENT

**THIS AGREEMENT** (the "**Agreement**") is made on March 1st, 2023.

**BETWEEN:**

(1)    **BITMAIN TECHNOLOGIES GEORGIA LIMITED**, a corporation incorporated under the laws of the State of Georgia, the United States of America (File No. 21203283), having its registered office at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076, USA ("**BITMAIN**"); and

(2)    **JWKJ Technologies LLC**, a corporation incorporated under the laws of the state of Florida, the United States of America (File No. L22000077767), having its registered office at 5060 Colonial Drive. #113, Orlando, FL. 32808  ("**Service Provider**").

Each of the parties to this Agreement is referred herein individually as a "**Party**" and collectively as the "**Parties**".

**WHEREAS:**

(A)    Service Provider is the owner and operator of the Data Center Facility (as defined below) and provides Services (as defined below) at the Data Center Facility.

(B)    BITMAIN intends to situate the Hosted Servers (as defined below) at the Data Center Facility and receive Services from Service Provider in accordance with the terms and conditions of this Agreement.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants set forth in this Agreement, the parties agree as follows:

**1.    DEFINITIONS AND INTERPRETATIONS**

1.1.    In this Agreement, these expressions have the following meanings:

"**Actual Hosting Unit Price**" means the effective unit price per kWh applicable during the relevant Billing Period under the applicable Service Order, which shall initially be the same as the Normal Hosting Unit Price set forth in such Service Order , subject to the adjustment mechanism in accordance with Article 3.2 and/or Article 6.9(c) (if applicable).

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly Controls, is Controlled by, or is under common Control with such Person.

"**Applicable Law**" means any treaty, law, decree, order, regulation, decision, statute, ordinance, rule, directive, code or other document that has legal force under any system of law, including, without limitation, local law, law of any other state or part thereof or international law, and which creates or purports to create any requirement

Exhibit A

**BITMAIN**

or rule that may affect, restrict, prohibit or expressly allow the terms of this Agreement or any activity contemplated or carried out under this Agreement.

"**Billing Period**" means the period of approximate one (1) month for which Service Provider issues invoices to BITMAIN for the Services provided by Service Provider during such period, the determination of which shall follow the following principle: (a) the first Billing Period shall commence from 00:00 (Beijing Time) on the Initial Date until 23:59 (Beijing Time) on the last calendar day of the same month, and (b) each of the subsequent Billing Periods shall commence from 0:00 (Beijing Time) on the first calendar day of the month following the previous Billing Period until 23:59 (Beijing Time) on the last calendar day of such month.

"**Business Day**" means a day (other than Saturday or Sunday) on which banking institutions in the Relevant Jurisdiction are open generally for business.

"**Control**" means, with respect to any Person, the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, provided that, in the case of a Person that is an entity, such power or authority shall conclusively be presumed to exist upon possession of beneficial ownership or power to direct the vote of more than fifty percent (50%) of the votes entitled to be cast at a meeting of the holders of the shares or other equity interests or registered capital of such Person or power to control the composition of a majority of the board of directors or similar governing body of such Person. The terms "**Controlled**" and "**Controlling**" have meanings correlative to the foregoing.

"**Data Center Facility**" means the data center facility owned and operated by Service Provider, details of which shall be submitted to BITMAIN in the form set forth in EXHIBIT A of APPENDIX I hereto, where Service Provider provides the Services to BITMAIN pursuant to the applicable Service Order(s).

"**Delayed Compensation**" means the corresponding amount payable by either Party as compensation for its delayed performance in accordance with Articles 3.4(b), 3.4(c) and 3.4(d).

"**Deposit**" means the amount payable by BITMAIN to Service Provider equal to one (1) month of the theoretical amount of the Hosting Fees for one Billing Period, based on the Hosting Quantity for the respective batch of the Hosted Servers, calculated in accordance with the following formula: Deposit = Hosting Quantity for the respective batch of the Hosted Servers $\times$ 3.6 (kW) $\times$ Normal Hosting Unit Price $\times$ 24 $\times$30; the specific amount of the Deposit shall be initially set forth in paragraph 3.1 of the applicable Service Order, subject to the adjustment in accordance with Article 6.1(b) and/or Article 6.1(e) (if applicable).

**BITMAIN**        v5.3

"**Digital Assets Price**" means the price of the applicable digital asset at the relevant hour (Beijing Time), denominated in US Dollars and published on the website of Coinmarketcap (https://coinmarketcap.com/).

"**End-Period Meter Reading**" means the meter reading of the Separate Meter taken at 23:59 (Beijing Time) on the last day of the applicable Billing Period.

"**Force Majeure**" means in respect of either Party, any event or occurrence whatsoever beyond the reasonable control of that Party, which delays, prevents or hinders that Party from performing any obligation imposed upon that Party under this Agreement, including to the extent such event or occurrence shall delay, prevent or hinder such Party from performing such obligation, war (declared or undeclared), terrorist activities, acts of sabotage, blockade, fire, lightning, acts of god, national strikes, riots, insurrections, civil commotions, quarantine restrictions, epidemics, earthquakes, landslides, avalanches, floods, hurricanes, explosions and regulatory and administrative or similar action or delays to take actions of any governmental authority.

"**Hosted Servers**" means the supercomputing servers and ancillary hardware equipment owned by BITMAIN or its designated third party(ies) and hosted at the Data Center Facility pursuant to the applicable Service Order.

"**Hosting Capacity**" shall have the meaning ascribed to it in the applicable Service Order.

"**Hosting Fee(s)**" means the fee for the Services payable by BITMAIN to Service Provider based on the Power Consumption during the applicable Billing Period, which shall be calculated in accordance with Article 3.1. For the avoidance of doubt, in no event shall the Hosting Fee be determined in accordance with the quantity of Hosted Servers.

"**Hosting Fee Ratio**" means the ratio of the Hosting Fee to the Theoretical Hashrate PPS Income during the relevant period.

"**Hosting Quantity**" means the agreed quantity of the Hosted Servers in accordance with the applicable Service Order, for which Service Provider shall provide the Hosting Capacity, the details of which shall be initially set forth in paragraph 2.1 of the applicable Service Order and subject to adjustment in accordance with Article 6.1(b) and/or Article 6.1(e), or other adjustment as agreed by the Parties; provided that the adjustment shall be confirmed in writing by the Parties by either emails or a supplemental agreement hereto.

"**Initial Date**" means the date on which the Hosted Servers under the first Service Order, or the first batch of Hosted Servers if there are more than one batch under the first Service Order, are powered-on for normal hosting and operation.

BITMAIN                                                                                    v5.3

"**Inventory Assets**" means any asset stored or kept by BITMAIN at the Data Center Facility other than the Hosted Servers, which may include, without limitation, servers or hardware equipment that are damaged, defective, malfunctioning or not operating, servers or hardware equipment that are returned for maintenance and repair, servers or hardware equipment that are backup to the Hosted Servers, the spare parts and components for the maintenance and repair of the Hosted Servers, and the packaging materials for the Hosted Servers.

"**Knowledge**" means with respect to Service Provider, the actual knowledge of Service Provider, and that knowledge which should have been acquired by Service Provider after making such due inquiry and exercising such due diligence as a prudent business person who would have made or exercised in the management of its business affairs, including but not limited to due inquiry of all necessary officers, directors and professional advisers of Service Provider and its Affiliates who could reasonably be expected to have knowledge of the matters in question.

"**Minimum Power Commitment**" means the commitment of power consumption of Service Provider pursuant to the applicable Power Purchase Agreement, the failure to utilize electrical power under which, or the failure to make payment of which regardless of the actual utilization, will constitute a breach of contract under such Power Purchase Agreement. The specific amount of the Minimum Power Commitment shall be set forth in the applicable Information Memorandum of Data Center Facility.

"**Minimum Hosting Unit Price**" shall have the meaning ascribed to it in the applicable Service Order.

"**Monitoring Software**" means the software designated by the Parties to monitor the operation of the Hosted Servers, which shall be AntSentry (version V2 or such other version as may be upgraded by BITMAIN from time to time) unless otherwise mutually agreed between the Parties in the applicable Service Order.

"**Monthly Theoretical Hosting Fee**" means the theoretical amount of the Hosting Fee for one (1) month, which shall be calculated in accordance with the following formula: Monthly Theoretical Hosting Fee = $\sum$ Rated Power of Each Hosted Server Powered-On (kW) × Normal Hosting Unit Price × 24 × 30.

"**Normal Hosting Unit Price**" shall have the meaning ascribed to it in the applicable Service Order.

"**Online Status**" means the status of a Hosted Server that is powered-on with constant supply of electrical power, has stable connection with network and is accessible via the Monitoring Software where the status tag "Online" is indicated for such Hosted Server.

BITMAIN

"**Online Status Ratio**" means a fraction where the numerator is the sum of the actual length of time of each Hosted Server in Online Status during the applicable Billing Period, and the denominator is the product of the Hosting Quantity of Hosted Servers and the theoretical length of time of each Hosted Server in Online Status during the applicable Billing Period. The Online Status Ratio shall finally be determined by the data as illustrated on the Monitoring Software, except that if there is a technical failure (including, but not limited to, technical failure of the Monitoring Software and/or the Hosted Servers, or offline of the NUC, etc.) that prevents from reading certain data, the aforementioned numerator and denominator shall be adjusted accordingly to subtract such time during which the relevant data cannot be read due to such technical failure, unless otherwise agreed by the Parties. For the avoidance of doubt, calculation of Online Status Ratio for purposes of Article 3.9 shall not be adjusted for any technical failures.

"**Permitted Disputed Items**" has the meaning ascribed to such term in Article 3.6(b)(iv).

"**Person**" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity (whether or not having separate legal personality).

"**Power-off Server(s)**" means Hosted Server(s) that is/are powered off voluntarily by BITMAIN pursuant to Article 5.1.

"**Power Consumption**" means the amount of electrical power consumed by the Hosted Servers during the applicable Billing Period, which shall be determined by subtracting the End-Period Meter Reading of the Billing Period immediately preceding the relevant Billing Period from the End-Period Meter Reading of the relevant Billing Period, the unit of which shall be kWh.

"**Power Purchase Agreement**" means the power purchase agreement, or other similar agreement for procurement of electrical power for the Data Center Facility, entered into between Service Provider and the relevant power supplier of the Data Center Facility.

"**Rated Hashrate**" means the rated hashrate stated on the factory label of the applicable Hosted Server.

"**Rated Power**" means the amount of the rated electrical power stated on the factory label of the applicable Hosted Server.

"**Reconciliation Statement**" means the statement issued by Service Provider to BITMAIN every Billing Period for reconciliation between the Parties, which shall set out details including but not limited to Power Consumption, the applicable Actual Hosting Unit Price, the Online Status Ratio, Hosting Fees chargeable, any occurrence

BITMAIN                                                                v5.3

of interruption or suspension of any Service during such Billing Period, the form of which is set out in APPENDIX II hereto.

"**Relevant Jurisdiction**" means the State of Georgia of the United States of America.

"**Separate Meter**" means the separate meter installed by Service Provider at the Data Center Facility for metering the electrical power consumed by the Hosted Servers.

"**Service**" means the hosting service(s) provided by Service Provider to BITMAIN pursuant to this Agreement subject to the actual service(s) agreed between the Parties in the applicable Service Order. For the avoidance of doubt, the Parties agree and acknowledge that the Service does not include any operation or maintenance of Hosted Servers.

"**Service Order(s)**" means the Service Order(s) executed by the Parties in the form set out in APPENDIX I hereto, as amended from time to time in accordance with this Agreement.

"**Theoretical Hashrate PPS Income**" means the theoretical earnings of the applicable Hosted Server based on the Rated Hashrate of such Hosted Server with reference to the prevailing network difficulty during the relevant period and the Digital Assets Price, which shall be calculated based on the real-time total network hashrate and the price of Bitcoin (BTC), with a sampling frequency of once an hour on a credible third-party platform[1], and the average value of the relevant data in each relevant period shall be the Theoretical Hashrate PPS Income of such period, the specific value shall be determined by the data as illustrated on the Monitoring Software. For avoidance of doubt, the Parties agree that: (a) when calculating the Hosting Fee Ratio for the Actual Hosting Unit Price Adjustment in accordance with Article 3.2 or the provision of Incentive Coupon in accordance with Article 3.9, the relevant period shall be the corresponding Billing Period; (b) when calculating the Hosting Fee Ratio for the voluntary power-off in accordance with Article 5, the relevant period shall be the consecutive 24*14 hours as stipulated in Article 5.1.

1.2.    In this Agreement, unless otherwise specified:

(i)      words importing the singular include the plural and vice versa where the context so requires;

(ii)     the headings in this Agreement are for convenience only and shall not be taken into consideration in the interpretation or construction of this Agreement;

(iii)    references to Articles and Appendix(es) are references to the articles and appendix(es) of this Agreement;

---

[1] Unless otherwise specified by BITMAIN, the third-party platform shall be the website of Coinmarketcap (https://coinmarketcap.com/).

BITMAIN                                                                                          v5.3

(iv)    references to days, dates and times are to the days, dates and times of the Relevant Jurisdiction, unless otherwise indicated;

(v)    any reference to a code, law, statute, statutory provision, statutory instrument, order, regulation or other instrument of similar effect shall include any re-enactment or amendment thereof for the time being in force;

(vi)    understanding and interpretation of this Agreement shall be based on the purpose of this Agreement and the original meaning of the context and prevailing understanding and practice in the industry, and provisions of this Agreement and relevant Appendix(es) shall be understood and interpreted as a whole;

(vii)    any prices or fees set forth in this Agreement are not subject to turnover taxes including but limited to sales and use tax, valued added tax and any other governmental charges and duties similar to the turnover tax according to the State tax regulation of the relevant jurisdiction (i.e. State of Missouri); and

(viii)    "**$**", "**US$**", "**US dollar**", "**US dollars**", "**dollar**" and "**dollars**" denote lawful currency of the United States of America.

## 2.    SCOPE OF SERVICES

Subject to the terms and conditions of this Agreement, Service Provider shall provide to BITMAIN, and BITMAIN shall receive from Service Provider, the Services agreed in each of the applicable Service Orders.

## 3.    HOSTING FEE AND PAYMENT

3.1.    <u>Hosting Fee Calculation</u>. Hosting Fee for each Billing Period shall be calculated as follows:

**Hosting Fee = Power Consumption × Actual Hosting Unit Price**

3.2.    <u>Actual Hosting Unit Price Adjustment</u>. Under each Service Order, the initial Actual Hosting Unit Price shall be the Normal Hosting Unit Price set forth in such Service Order, subject to the following adjustment for each Billing Period:

(a)    *Downward Adjustment*.    If the Hosting Fee Ratio for such Billing Period is higher than 90%, the Actual Hosting Unit Price applicable to such Billing Period shall be adjusted to the higher of:

(i)    an amount equal to the result of (x) 80% of aggregate of the Theoretical Hashrate PPS Income during such Billing Period, divided by (y) Power Consumption of such Billing Period; or

(ii)    the Minimum Hosting Unit Price.

BITMAIN                                                                    v5.3

(b)  *Upward Restoration*. In the event that (x) the Actual Hosting Unit Price is lower than the Normal Hosting Unit Price, and (y) the Hosting Fee Ratio for such Billing Period is no higher than 60%, the Actual Hosting Unit Price applicable to such Billing Period shall be adjusted to the lower of:

(i)  an amount equal to the result of (x) 80% of aggregate of the Theoretical Hashrate PPS Income during such Billing Period, divided by (y) Power Consumption of such Billing Period; or

(ii)  the Normal Hosting Unit Price.

(c)  In the event there are more two or more types of Hosted Server(s), the Hosting Fee Ratio and adjustment of Actual Hosting Unit Price for a Billing Period shall be calculated and applied respectively for each type of Hosted Server(s).

3.3.  <u>Other Fees</u>. Other fees set forth in the applicable Service Order shall be paid in accordance with such Service Order on a pay-per-use basis; provided that these fees may only be incurred after prior written approval of BITMAIN.

3.4.  <u>Deposit</u>.

(a)  <u>Payment of Deposit</u>.  For each batch of Hosted Servers under the applicable Service Order, BITMAIN shall pay to Service Provider the Deposit in accordance with paragraph 3.1 of such Service Order on or before the seventh (7th) Business Day from each date Service Provider has provided BITMAIN with documentation reasonably demonstrating that it is reasonable to have the Data Center Facility connected to electrical power in respect of the respective batch of the Hosted Servers based on the construction progress and that the construction of the Data Center Facility is progressing to BITMAIN's satisfaction.

(b)  <u>Delayed Compensation</u>. The amount of the Delayed Compensation shall be calculated as follows:

**Delayed Compensation = $\sum$Rated Power of each delayed Hosted Server (kW) × US\$0.01 × Number of delayed hours (any fractional delay of an hour shall be rounded up to next hour)**

(c)  <u>Delay in Delivery of Hosted Servers</u>. Except as otherwise agreed by both Parties, in the event that BITMAIN fails to deliver the respective batch of Hosted Servers to the Data Center Facility on or before (x) the Initial Date, or (y) the estimated arrival date for the respective batch of Hosted Servers as set forth in paragraph 2.2 of the applicable Service Order, whichever is later:

(i)  Service Provider shall be entitled to deduct from the Deposit the corresponding Delayed Compensation in accordance with the

# BITMAIN

corresponding number of hours and number of Hosted Servers delayed; and

(ii)    if BITMAIN fails to remedy such delay within thirty (30) calendar days, Service Provider shall be entitled to terminate this Agreement by notice with immediate effect. Service Provider shall unconditionally remit the difference between the Deposit which has been paid by BITMAIN and the deducted Delayed Compensation to BITMAIN within seven (7) Business Days from the termination of this Agreement.

(d)    <u>Delay in Power-On of Hosted Servers</u>.

(i)    Except as otherwise agreed by both Parties, Service Provider shall, to the satisfaction of BITMAIN, connect (1) the Data Center Facility to electrical power, and (2) enable the Data Center Facility to reach its standard operational conditions for the respective batch of Hosted Servers on or before (x) the Initial Date, or (y) the estimated power-on date for each batch of Hosted Servers as set forth in paragraph 2.1 of the applicable Service Order, whichever is later.

(ii)    In the event that either of the conditions set forth in Article 3.4(d)(i) fails to be satisfied on time, Service Provider shall immediately be liable to pay to BITMAIN the corresponding Delayed Compensation in accordance with the corresponding number of hours and number of Hosted Servers delayed.

(iii)    In the event that either of the conditions set forth in Article 3.4(d)(i) fails to be satisfied for more than thirty (30) calendar days, BITMAIN shall be entitled to terminate this Agreement by notice with immediate effect. Service Provider shall unconditionally remit to BITMAIN the Deposit that has been paid by BITMAIN in full and all Delayed Compensation within seven (7) Business Days from the termination of this Agreement.

(e)    In case of any adjustment of Deposit in accordance with Article 6.1(b) and/or Article 6.1(e), Service Provider shall return the respective difference between the pre-adjustment Deposit and the post-adjustment Deposit in full to BITMAIN in accordance with Article 6.1(b) and/or Article 6.1(e).

(f)    Unless otherwise stipulated in the Agreement, the Deposit that has been paid by BITMAIN and not yet returned in accordance with Article 6.1(b) and/or Article 6.1(e) shall be returned to BITMAIN in full unconditionally within seven (7) Business Days from the expiration or termination of this Agreement, regardless of whether any disputed amounts are outstanding under this Agreement.

# BITMAIN

3.5. <u>Prepayment of Hosting Fee</u>. Prepayments of Hosting Fee shall be made by BITMAIN to Service Provider as follows:

    (a) <u>Prepayment</u>. Within seven (7) Business Days from the date on which BITMAIN has been provided documentation that Service Provider has sufficient procurement that the Data Center Facility has been connected to electrical power and reaches its standard operational conditions for the respective batch of Hosted Servers on or before (x) the Initial Date, or (y) the estimated power-on date for each batch of Hosted Servers as set forth in paragraph 2.1 of the applicable Service Order, or (z) in the event that Service Provider does not perform its obligations under Article 3.4(d)(i) on time, the seventh (7th) Business Day after Service Provider has provided BITMAIN with documentation certifying that it has completed its relevant obligations, whichever is later, BITMAIN shall pay a prepayment to Service Provider in the amount of one (1) month's Monthly Theoretical Hosting Fee calculated based on the actual quantity of such batch of Hosted Servers powered-on (the "**Prepayment**").

    (b) <u>Return of Prepayment</u>. Each Prepayment shall be used to offset the finally determined Hosting Fee of the corresponding batch of Hosted Servers for the first Billing Period and the subsequent Billing Periods (if there is any Balance) in accordance with Article 3.6. If there is any unused Prepayment at the expiration or termination of this Agreement, Service Provider shall unconditionally return such unused Prepayment in full to BITMAIN within seven (7) Business Days from the termination or expiration of this Agreement, regardless of whether any disputes have occurred during the Term of this Agreement.

3.6. <u>Invoice, Payment and Settlement Mechanism</u>.

    (a) <u>Invoice</u>. Service Provider shall issue the invoice of the Hosting Fee for the previous Billing Period to BITMAIN within seven (7) Business Days from the end of such Billing Period, with (i) the Reconciliation Statement for such Billing Period; and (ii) the supporting documents proving the Power Consumption for the such Billing Period (e.g., photos of the Separate Meter showing the Power Consumption at the end of such Billing Period) as attachments to the invoice.

    (b) <u>Revision Against Objection and Payment</u>. BITMAIN shall be entitled to raise to Service Provider any objection to an invoice (including its attachments) issued by Service Provider in accordance with Article 3.6(a) within five (5) Business Days upon receipt of such invoice:

        (i) Except as otherwise agreed by both Parties, in the event that BITMAIN raises no objection to an invoice or its attachments within the aforementioned period, it shall be deemed that BITMAIN has

**BITMAIN**

approved the invoice and BITMAIN shall pay to Service Provider the Hosting Fee in the invoice within seven (7) Business Days after BITMAIN's receipt of the invoice, subject to the Settlement Mechanism in accordance with Article 3.6(c).

(ii)    In the event that BITMAIN raises any objection to an invoice and/or its attachments within the aforementioned period, the Parties shall diligently and expeditiously cooperate to resolve the discrepancies based on the factors in disputes, such as, without limitation, Power Consumption, Hosting Fee Ratio and Actual Hosting Unit Price (including Actual Hosting Unit Price after adjustment as agreed in accordance with this Agreement, if applicable) within seven (7) Business Days upon BITMAIN's raising of objection (the "**Confirmation Period**"). Should the Parties successfully resolve all discrepancies within Confirmation Period, as extended by mutual agreement of both Parties (such agreed amount, the "**Confirmed Hosting Fee**"), BITMAIN shall pay the Service Provider the Hosting Fee in an amount equal to the Confirmed Hosting Fee within seven (7) Business Days after the agreement to the Confirmed Hosting Fee provided that Service Provider has issued an updated invoice to BITMAIN in an amount equal to such Confirmed Hosting Fee (if the Confirmed Hosting Fee differs from the Hosting Fee shown in the original invoice).

(iii)    In the event that the Parties are unable to resolve any objection to an invoice in accordance with Article 3.6(b)(ii) (such disputed invoice, the "**Disputed Hosting Fee**"), the Parties shall promptly refer the Disputed Hosting Fee along with all items and calculations therein to an impartial nationally recognized firm of independent chartered professional accountants appointed by mutual agreement of BITMAIN and the Service Provider (the "**Independent Accountant**"). The Independent Accountant shall be directed to render a written report on the Disputed Hosting Fee by confirming the calculations of the Power Consumption, Actual Unit Hosting Price, Delayed Compensation and Incentive Coupon (collectively, the "**Permitted Disputed Items**") as promptly as practicable but in no event greater than **thirty (30)** days after such submission to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the objection of BITMAIN provided under Article 3.6(b)(ii) in accordance with the terms of this Agreement. If a Disputed Hosting Fee involves the resolution of any disputed items other than the Permitted Disputed Items, then such Disputed Hosting Fee shall not be eligible for resolution by the Independent Accountant and shall be resolved using the dispute resolution provisions within Article 16.4 hereof. If a Disputed Hosting Fee is submitted to the Independent Accountant, the

BITMAIN                                                                                        v5.3

Service Provider shall grant the Independent Accountant reasonable access, during regular business hours and on reasonable advance notice, to the Service Provider's books and records, personnel and facilities, and the Service Provider and BITMAIN shall each furnish to the Independent Accountant such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items acting as an expert and not as an arbitrator based solely on the applicable definitions and other terms in this Agreement. The resolution of the disputed items and final determination of the Disputed Hosting Fee by the Independent Accountant shall be within the range of values assigned to each such item submitted by BITMAIN and the Service Provider and shall be final and binding on the Parties hereto absent manifest error. The fees and expenses of the Independent Accountant shall be borne by (i) BITMAIN on the one hand and the Service Provider on the other hand, in proportion to the amounts by which their respective calculations of the Disputed Hosting Fee differ from the Hosting Fee as finally determined by the Independent Accountant.

For avoidance of doubt, the Parties agree that Service Provider shall not suspend provision of Services or terminate this Agreement or any Service Order for failure of BITMAIN to make payment before the Hosting Fee (including the Confirmed Hosting Fee and/or the Disputed Hosting Fee) has been finally determined and due in accordance with this Article 3.6(b). If BITMAIN fails to make payment when the Hosting Fee (including the Confirmed Hosting Fee and/or the Disputed Hosting Fee) has been finally determined and due within sixty (60) calendar days, Service Provider shall be entitled to terminate this Agreement by notice with immediate effect.

(c)     Settlement Mechanism. The Disputed Hosting Fee for each Billing Period shall be settled in accordance with the following mechanism:

For the First Billing Period:

(i)     if the amount of Hosting Fee in the invoice equals to the Prepayment provided in accordance with Article 3.5, the Hosting Fee in the invoice shall be deemed as fully settled on the date of the invoice;

(ii)     if the amount of Hosting Fee in the invoice is less than the Prepayment provided in accordance with Article 3.5, the Hosting Fee in the invoice shall be deemed as fully settled on the date of the invoice and the portion of the difference between the Prepayment and the Hosting Fee (the "**Balance**") shall be used to offset the Hosting Fee in the subsequent invoice(s); and

# BITMAIN

v5.3

(iii)   if the amount of the Hosting Fee in the invoice is more than the Prepayment provided in accordance with Article 3.5, BITMAIN shall pay to Service Provider the difference between the Prepayment and the amount of Hosting Fee in the invoice on or before the Hosting Fee is due in accordance with Article 3.6(b) and the Hosting Fee in the invoice shall be deemed as fully settled upon BITMAIN's payment of such difference.

For the Subsequent Billing Periods:

(iv)   BITMAIN shall pay the amount of the Hosting Fee in the invoice after deducting the Balance (if any) on or before the Hosting Fee is due in accordance with Article 3.6(b).

3.7.   Confirmation of Hosted Servers Security. Notwithstanding the foregoing, Service Provider shall issue a Confirmation of Hosted Servers' Security (in the form as attached in APPENDIX III hereto) of providing Hosted Servers' latest information and the current business operation of Service Provider within not more than seven (7) Business Days before the due date of each of BITMAIN's payments hereunder, otherwise BITMAIN is entitled to postpone any payments until such confirmation is provided.

3.8.   Payment Method of Hosting Fee. All payment of Hosting Fee pursuant to this Agreement, including any remittance or refund of Hosting Fee, shall be made in accordance with paragraph 4.2 of the applicable Service Order.

3.9.   Incentive Coupon. BITMAIN shall provide a coupon ("**Incentive Coupon**") to Service Provider in an amount equal to 5% of the Hosting Fee of such two consecutive Billing Periods, in the event that Online Status Ratio of such two consecutive Billing Periods is no less than 98%. For the purpose of this Article 3.9, the Online Status Ratio shall be calculated strictly in accordance with the formula as forth herein without consideration for technical failures or any power outage due to any reasons, including but not limited to any event of Force Majeure, technical failure or severe weather.

3.10.   Increased Cost. If there are any increases, changes in, or introduction or administration of, any new taxes, levies, tariffs, utility cost increase, governmental fees or charges with respect to the provision of Services or the operation of the Data Center Facility, Service Provider shall not pass through any of such amounts to BITMAIN. The Parties shall solely apply Article 3.2 or Article 6.9(c) or other applicable provisions under this Agreement to adjust the Hosting Fee.

3.11.   Set-off. BITMAIN may set-off and deduct for any amounts payable under this Agreement to Service Provider any amounts owing by Service Provider to BITMAIN pursuant to this Agreement.

BITMAIN                                                                                                    v5.3

**4.    REPRESENTATIONS AND WARRANTIES**

4.1.    Each of the Parties hereby makes the following representations and warranties to the other Party:

(a)    It has the full power and authority to own its assets and carry on its businesses.

(b)    The obligations expressed to be assumed by it under this Agreement are legal, valid, binding and enforceable obligations.

(c)    It has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement.

(d)    The entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not conflict with:

(i)    any Applicable Law;

(ii)    its constitutional documents; or

(iii)    any agreement or instrument binding upon it or any of its assets.

(e)    All authorizations required or desirable:

(i)    to enable it to lawfully enter into, exercise its rights under and comply with its obligations under this Agreement;

(ii)    to ensure that those obligations are legal, valid, binding and enforceable; and

(iii)    to make this Agreement admissible in evidence in its jurisdiction of organization,

have been, or will have been by the time, obtained or effected and are, or will by the appropriate time be, in full force and effect.

(f)    It is not aware of any circumstances which are likely to lead to:

(i)    any authorization obtained or effected not remaining in full force and effect;

(ii)    any authorization not being obtained, renewed or effected when required or desirable; or

(iii)    any authorization being subject to a condition or requirement which it does not reasonably expect to satisfy or the compliance with which has or could reasonably be expected to have a material adverse effect.

BITMAIN                                                                                    v5.3

4.2.    Service Provider hereby makes the following representations and warranties to BITMAIN:

    (a)    It has provided BITMAIN with all the information and materials of which it has Knowledge in accordance with BITMAIN's due diligence checklist. No information or materials provided by it in the due diligence process, when taken as a whole, contains any untrue statement or omits to state any material fact. There is no information that Service Provider has not disclosed to BITMAIN in response to BITMAIN's inquiry, of which any of Service Provider's Representatives has Knowledge.

    (b)    The Services shall be free from defects and shall meet the specifications as stipulated herein (including but not limited to provisions of Article 6). Without prejudice to BITMAIN's other rights, in the event of any breach of this warranty, Service Provider shall make prompt payment of the fair market value for such Hosted Servers to BITMAIN if the Hosted Servers are damaged, lost or have other abnormalities due to reasons attributable to Service Provider.

## 5.    VOLUNTARY POWER-OFF

5.1.    In the event that the Actual Hosting Unit Price for any Billing Period has been adjusted to the Minimum Hosting Unit Price in accordance with Article 3.2, and the Hosting Fee Ratio has remained at 90% or higher for a consecutive of 24*14 hours in the subsequent Billing Period, BITMAIN shall be entitled to voluntarily power off any or all of the Hosted Servers in its sole discretion.

5.2.    Any Power-off Server may remain on rack at the Data Center Facility for a period of fourteen (14) calendar days (exclusive of the first day on which such Power-off Server is powered off, the "**Voluntary Power-off Period**"), during which period BITMAIN shall be entitled to re-power on such Hosted Server in its sole discretion at any time. At the expiration of the Voluntary Power-off Period, the Parties shall negotiate in good faith to mitigate losses to the utmost extent.

5.3.    During the Voluntary Power-off Period, Service Provider may request BITMAIN to continue operating certain number of Power-off Servers that total Power Consumption of which shall not exceed the Minimum Power Commitment, and all the earning of such Hosted Servers shall solely owned by BITMAIN. In the event the Hosting Fees during such period exceed the amount of earnings, Service Provider shall compensate BITMAIN for the differences between such amount of earnings and Hosting Fees.

## 6.    OPERATION ENVIRONMENT OF DATA CENTER FACILITY

6.1.    <u>Conditions of the Data Center Facility</u>. No later than the Initial Date and at all times up to and until the termination of this Agreement, Service Provider shall provide BITMAIN with sufficient server rooms, server positions, racks, power load and

# BITMAIN

facilities, broadband network and network facilities, heat dissipation facilities, sand, rain and snow-proofing facilities, temperature and humidity monitoring and sensing equipment, security monitoring and other equipment reasonably required for the normal operation of the Hosted Servers of the reasonable commercial standard, satisfying at least the following requirements:

(a)     There shall be at least two operators' dedicated network line access, network bandwidth configuration of 100Mbps per 10,000 miners, and network latency of no more than 100ms (based on the ping value from the Hosted Servers' intranet IP to ANTPOOL). Besides, a network environment containing RJ45 interfaces shall be provided for the Monitoring Software's servers in the Data Center Facility's operation and maintenance network;

(b)     The temperature of the air inlet of any Hosted Server at any time shall not be higher than 35℃ or lower than 5℃. If the temperature conditions (especially high-temperature conditions) of the Data Center Facility are not satisfied, BITMAIN shall be entitled to reduce the Hosting Quantity of Hosted Servers to satisfy the heat dissipation requirements of the miners at its sole discretion, and Service Provider shall (i) unconditionally cooperate with BITMAIN to move the de-racked Hosted Servers due to temperature reasons designated by BITMAIN out of the server room, and (ii) adjust the amount of the Deposit in accordance with the reduced Hosting Quantity and return the difference between the pre-adjustment Deposit and the post-adjustment Deposit in full to BITMAIN within seven (7) Business Days from reduction of the Hosting Quantity;

(c)     The environmental humidity of the Data Center Facility at any time shall not be higher than 75% or lower than 10%;

(d)     The measurement range of the temperature and humidity monitoring and sensing equipment shall cover -30℃ to 60℃. Temperature and humidity monitoring and sensing equipment may be wired transmission equipment or wireless transmission equipment, for the convenience of operation and maintenance real-time monitoring;

(e)     The power load provided by Service Provider shall satisfy the requirements of this Agreement, the Service Orders and standard operational conditions. In the event that the power load is insufficient for any reason (including but not limited to damage to power supply equipment, insufficient supply from the power supplier, or policy changes at the location of the Data Center Facility), BITMAIN shall be entitled to reduce the Hosting Quantity of the Hosted Servers at its sole discretion, and Service Provider shall (i) unconditionally cooperate with BITMAIN to move the de-racked Hosted Servers due to insufficient power load designated by BITMAIN out of the server room, and (ii) adjust the amount of the Deposit in accordance with the reduced Hosting

# BITMAIN

Quantity and return the difference between the pre-adjustment Deposit and the post-adjustment Deposit in full to BITMAIN within seven (7) Business Days from reduction of the Hosting Quantity; and

(f)    There shall be sufficient forklifts, lift trucks and other related machinery and equipment to provide timely racking and de-racking services for the Hosted Servers.

6.2.    Exclusive Server Room. Service Provider shall provide exclusive server room(s) for the storage and operation of the Hosted Servers, which shall be physically separated from server rooms at the Data Center Facility for use by other customers of Service Provider. No server and/or other hardware equipment other than the Hosted Servers may be allowed in such exclusive server room(s) unless with prior written approval of BITMAIN. Service Provider shall take necessary measures satisfactory to BITMAIN to separate the Hosted Servers from other servers and/or hardware equipment, including but not limited to labeling the Hosted Servers. Besides, Service Provider shall provide room, network and power supply for the Monitoring Software, separate from the Hosted Servers.

6.3.    Standard Hosting Environment. Service Provider shall maintain the standard hosting environment for the Hosted Servers in accordance with the conditions set forth in the applicable Service Order.

6.4.    Title and Ownership. Service Provider warrants and represents that it has good title to, or right by license, lease or other agreement to use, the Data Center Facility, and there is no actual, pending or threatened dispute or other claim as to title and ownership of the Data Center Facility.

6.5.    Safety and Security. Server Provider shall take standard industry practices and all necessary measures, as well as install all necessary facilities, to ensure safety and security of the Data Center Facility and the Hosted Servers against any safety accidents such as damage, loss or fire outbreak, etc. or any faults such as dust ingress, water ingress or snow ingress, etc. If any Hosted Server is damaged, lost or has other abnormalities due to reasons attributable to Service Provider, Service Provider shall indemnify BITMAIN against its losses arising therefrom based on the fair market value of such Hosted Server.

6.6.    Compliance with Applicable Law. Service Provider shall ensure that the operation of the Data Center Facility, the individuals of Service Provider and provision of Services is at all times in compliance with Applicable Laws and that any and all applicable approvals, certificates, orders, authorizations, permits, qualifications and consents required for the operation of the Data Center Facility and provision of Services have been obtained no later than the Initial Date and are not revoked, cancelled or expired (unless properly renewed on or prior to such expiry) up to and until the termination of this Agreement. The Parties recognize that it is Service Provider's sole and exclusive responsibility to maintain a safe and healthy work environment at the Data Center

**BITMAIN**                                                                      v5.3

Facility that is free from recognized hazards and fully complies with the Applicable Laws, including without limitation, the federal Occupational Safety and Health Act ("**OSHA**", if applicable), as well as any similar state or local laws. Accordingly, Service Provider promises and hereby covenants to maintain a safe and healthy work environment at the work places including but not limited to the Data Center Facility and the necessary onsite production and living facilities including office rooms, maintenance rooms, canteen, dormitory and toilets, that is free from recognized hazards and fully compliant with OSHA (if applicable), and any similar state or local laws, to ensure the safety of BITMAIN Personal (as defined below) during their work. Besides, Service Provider shall organize necessary safety training and safety drills for BITMAIN Personal on a regular basis.

6.7.    24/7 Access by BITMAIN Personnel. If there is no other specific agreement, BITMAIN or the third party designated by BITMAIN (collectively, the "**O&M Service Provider**") shall be responsible for the operation and maintenance of the Hosted Servers. The O&M Service Provider may appoint one or more individuals ("**BITMAIN Personnel**") to carry out operation and maintenance activities on the Hosted Servers onsite at the Data Center Facility on a 24-hour per day, 7-day per week basis. Service Provider shall provide all necessary support and cooperation for the operation and maintenance of the Hosted Servers by BITMAIN Personnel, including but not limited to that Service Provider shall grant BITMAIN Personnel access and permit to:

(a)    enter into the Data Center Facility;

(b)    obtain the operational data of the Hosted Servers;

(c)    inspect the operational conditions of the Data Center Facility;

(d)    perform maintenance on the Hosted Servers;

(e)    handle or repair any Hosted Servers that may be damaged, defective, malfunctioning or not operating; and

(f)    check, examine and conduct inventory audits of the Hosted Servers and Inventory Assets.

6.8.    Test Site. Service Provider shall provide BITMAIN Personnel with proper test site for operation and maintenance of the Hosted Servers that meets the safety and security requirements. The test site shall provide 220V power supply and necessary network access, and shall have no less than 5 power outlets and 5 network interfaces unless otherwise required by BITMAIN Personnel.

6.9.    Online Status Ratio.

(a)    Subject to the Actual Hosting Unit Price adjustment in accordance with Article 3.2, Service Provider shall ensure that the Online Status Ratio in each

# BITMAIN

Billing Period is no less than 95%, unless such below-95% Online Status Ratio is caused solely by the defects of the Hosted Servers or the inappropriate operation of the Hosted Servers by BITMAIN Personnel.

(b)  If the Online Status Ratio for any Billing Period is less than 95% due to any substandard condition of the Data Center Facility, including but not limited to, power connection, network connection, heat dissipation, water purification and/or other infrastructure, Service Provider shall have a period of one (1) month to remedy such substandard condition.

(c)  If the Online Status Ratio for the Billing Period immediately after the one-month remedial period continues to be less than 95%, BITMAIN shall be entitled to (i) terminate this Agreement with immediate effect without any liability for breach of contract, or (ii) a further reduction of the Actual Hosting Unit Price so that the Actual Hosting Unit Price for such Billing Period shall be the product of the current Actual Hosting Unit Price which has been adjusted pursuant to Article 3.2 multiplied by the Online Status Ratio immediately after the one-month remedial period with effect from the expiry of the remedial period up to and until the Online Status Ratio for a Billing Period is no less than 95%.

6.10.  <u>Inventory Storage</u>. In addition to the space required for hosting of the Hosted Servers, Service Provider shall provide sufficient space to BITMAIN for storage and safe-keeping of Inventory Assets.

6.11.  <u>Installation and Accuracy of Separate Meter</u>. Service Provider shall install Separate Meter(s) at the Data Center Facility to monitor the electrical power consumed by the Hosted Servers, and shall cooperate with BITMAIN to check and calibrate the accuracy of the Separate Meter(s) regularly or occasionally in accordance with BITMAIN's request and instructions, to ensure the constant accuracy of the Separate Meter(s).

6.12.  <u>Inventory Audit</u>. BITMAIN shall be entitled to conduct inventory audits of the Hosted Servers regularly or occasionally, and Service Provider shall provide assistance and convenience accordingly. If the result of the inventory audit does not match the information as stipulated in the applicable Service Order, Service Provider shall assist BITMAIN to discover the reasons. If any Hosted Server is lost, Service Provider shall indemnify BITMAIN against its losses arising therefrom based on the fair market value of such Hosted Server.

## 7.  INSURANCE

7.1.  BITMAIN may keep, or procure the owner of the Hosted Servers (as applicable) to keep, in full force and effect during the Term of this Agreement appropriate commercial general liability insurance and property insurance covering the Hosted Servers, at the expense of the applicable owner of the Hosted Servers.

**BITMAIN**

7.2.    In the event of any damage or loss of the Hosted Servers and upon request of BITMAIN, Service Provider shall provide BITMAIN and/or the owner of the Hosted Servers (as applicable) with documents and information in support of the insurance claim made to the insurance company.

7.3.    In the event of any damage or loss of the Hosted Servers caused by or results from the negligence or willful misconduct of Service Provider and that the insurance is unavailable or insufficient to cover the losses of BITMAIN and/or the owner of the Hosted Servers (as applicable), Service Provider shall be liable to indemnify BITMAIN (for and on behalf of the owner of the Hosted Servers, as applicable) for the difference between the insurance coverage, if any, and such losses.

## 8.    TITLE AND OWNERSHIP OF HOSTED SERVERS

8.1.    <u>Ownership of Hosted Servers</u>. Subject to Articles 8.2 and 8.3, Service Provider acknowledges and agrees that the Hosted Servers and Inventory Assets are assets of BITMAIN or any third party designated by BITMAIN (as applicable) (collectively, the "**Owner of Hosted Servers**") and the Owner of Hosted Servers shall solely have the proprietary interest in the Hosted Servers. The Owner of Hosted Servers' such interest shall not be affected by any factors, including but not limited to Service Provider's operating conditions, financial conditions or any disputes or lawsuits against its shareholders or any third parties. In no event shall Service Provider's creditors, shareholders or other third parties be entitled to file disputes regarding the ownership of the Owner of Hosted Servers. Without prejudice to the foregoing, in the event that any such dispute occurs, Service Provider shall provide the Owner of Hosted Servers with all reasonable assistance in proving the Owner of Hosted Servers' proprietary interest in the Hosted Servers.

8.2.    <u>Priority Right</u>. In the event that the Owner of Hosted Servers proposes to dispose of any Hosted Server that is owned by such Owner of Hosted Servers (the "**Offered Server**"), the Owner of Hosted Servers shall give Service Provider notice (the "**Disposal Notice**") of such proposed disposal at least seven (7) days prior to the proposed disposal, and Service Provider shall be entitled to purchase such Offered Server(s) at the price and on the terms specified in the Disposal Notice. If Service Provider waives such priority right, fails to respond to the Disposal Notice, or fails to execute the purchase agreement of the Offered Server(s) within seven (7) days since the date of the Disposal Notice, the Owner of Hosted Servers shall be entitled to dispose the Offered Server(s) to any third party without any limitation.

8.3.    <u>Transfer of Rights</u>. Subject to Article 8.2, if the Owner of Hosted Servers transfers all or part of the Offered Server(s) to a third party, BITMAIN shall be entitled to transfer its rights and obligations with regard to the Services hereunder associated with such Offered Server(s) hereunder to such third-party purchaser, and Service Provider shall provide corresponding assistance and execute the relevant documents in this regard.

## 9.    INDEMNIFICATION

**BITMAIN**                                                                                          v5.3

9.1.   Service Provider shall indemnify, defend, and hold BITMAIN and its Affiliates, and
       its and their officers, directors, agents, and employees, harmless from and against any
       third-party action, claim, suit, proceeding, demand, investigation, or charge alleging
       any costs, losses, liabilities, damages, fines, judgments, fees, or expenses (including
       reasonable attorneys' fees and court costs) directly or indirectly, as a result of, or
       based upon or arising out of: (i) Service Provider's performance of the Services
       hereunder; (ii) any failure to comply with Applicable Law in connection with the
       Services or this Agreement; (iii) any liability or damage incurred by reason of any act
       or omission of Service Provider; or (iv) facts, which if true, would constitute a breach
       of any of Service Provider representations, warranties, or covenants hereunder,
       including, but not limited to, Service Provider fails to provide Services required by
       BITMAIN in accordance with this Agreement, such as frequent power outages at the
       Data Center Facility, Data Center Facility being shut down or being required to make
       improvements by competent authorities, etc., which prevents Hosted Servers from
       being in a stable Online Status. Should (1) in the event that BITMAIN asserts claim(s)
       against Service Provider, Service Provider fails to respond to the claim and take
       remedial action satisfactory to BITMAIN within ten (10) days following receipt of
       written notice thereof from BITMAIN; or (2) in the event that any third party asserts
       claim(s) against Service Provider and/or BITMAIN, Service Provider fails to use
       counsel reasonably acceptable to BITMAIN within ten (10) days following receipt of
       written notice thereof from BITMAIN, BITMAIN shall be entitled to terminate this
       Agreement by written notice with immediate effect and control the defense and
       settlement of any such claim using counsel of its own choice with Service Provider
       bearing the costs and expenses of such representation (if applicable). Service Provider
       may not settle any action, claim, suit, proceeding, demand, investigation, or charge
       under this Article 9.1 without BITMAIN's prior written consent. For avoidance of
       doubt, BITMAIN shall be entitled to participate in any defense using its own counsel
       at its own cost.

9.2.   Subject to other provisions of this Article 9, each Party hereby agrees to indemnify,
       defend and hold harmless the other Party and its respective Affiliates, officers,
       directors, agents and employees from and against any and all losses, liabilities,
       damages, liens, claims, obligations, judgments, penalties, deficiencies, costs and
       expenses (including reasonable attorneys' fees and court costs) resulting from or
       arising out of any breach or omission of performance by such Party of any of the
       representations, covenants or other agreements in this Agreement.

**10.    FORCE MAJEURE**

10.1.  A Party shall not be considered to be in default or breach of this Agreement and shall
       be excused from performance or liability for damages to the other Party, if and to the
       extent that the performance of any obligation of such Party under this Agreement
       (other than an obligation to make payment) is prevented, frustrated, hindered or
       delayed as a consequence of an event of Force Majeure, *provided* that:

BITMAIN                                                                          v5.3

(a) such Party claiming to benefit under this Article 10.1 (the "**Affected Party**") shall:

(i) immediately and in any event no later than 24 hours from the occurrence of such event of Force Majeure, give the other Party (the "**Non-Affected Party**") a written notice (including via email) setting out details of such event of Force Majeure; and

(ii) within three (3) days from the occurrence of such event of Force Majeure, produce to the Non-Affected Party supporting materials evidencing such event of Force Majeure and how its occurrence prevented, frustrated, hindered or delayed the performance of the Affected Party's obligation under this Agreement;

(b) the Affected Party shall take all necessary measures to mitigate the impact of such event of Force Majeure and shall resume normal performance of this Agreement promptly after the removal of such event of Force Majeure, unless it is impracticable or unnecessary to resume the performance of this Agreement; and

(c) Notwithstanding any other agreement to the contrary in this Agreement, Service Provider shall unconditionally waive BITMAIN's Hosting Fees for the duration of the Hosted Servers' inoperability due to the effects of such Force Majeure event.

10.2. If the normal performance of this Agreement cannot be resumed within fourteen (14) calendar days from the occurrence of such event of Force Majeure, BITMAIN shall be entitled to terminate this Agreement with immediate effect without any liability for breach of contract.

**11. TERM AND TERMINATION**

11.1. Term. This Agreement shall have a term effective from the date hereof (i.e., March 1st, 2023) (the "**Effective Date**") and expiring on the second (2nd) anniversary of the Initial Date (i.e., March 14, 2025) (the "**Term**").

11.2. Termination. This Agreement may be terminated prior to the expiry of the Term:

(a) upon mutual agreement in writing of the Parties;

(b) upon either Party giving a written notice to the other Party if such other Party (i) files in any court or agency pursuant to any Applicable Law, a petition in bankruptcy or insolvency or for reorganization or for an arrangement or for the appointment of a receiver or trustee of such other Party or of its assets, (b) is served with an involuntary petition against it, filed in any insolvency proceeding that is not dismissed within ninety (90) days after the filing thereof, (c) makes an assignment of the assets associated with this Agreement for the



benefit of its creditors, (d) fails to maintain or renew any material business registration license, approval or permit that is required under any Applicable Law to carry out its normal business, (e) is subject to actual or potential liquidation, winding up, or dissolution, or (f) authorizes or consummates the merger, acquisition, reorganization, consolidation, business combination or similar transaction, or any transaction or series of transactions in which in excess of 50% of such other Party's voting power is transferred;

(c)     upon Service Provider giving a written notice to BITMAIN to terminate pursuant to Article 3.4(c)(ii) or other applicable articles if the situation has not been improved after negotiation between the Parties, and a compensation in an amount equal to Monthly Theoretical Hosting Fee shall be paid by BITMAIN to Service Provider upon termination;

(d)     upon BITMAIN giving a written notice to Service Provider to terminate pursuant to Article 3.4(d)(iii), Article 6.9(c), Article 9.1, Article 15.3 or other applicable articles if the situation has not been improved after negotiation between the Parties, and a compensation in an amount equal to Monthly Theoretical Hosting Fee shall be paid by Service Provider to BITMAIN upon termination;

(e)     upon either Party giving a written notice of its intention to terminate this Agreement in whole or in part of no less than sixty (60) calendar days to the other Party, *provided that* a compensation in an amount equal to Monthly Theoretical Hosting Fee shall be paid by this Party to such other Party upon termination and the termination shall be effective only to the extent of such notice; and

(f)     upon BITMAIN giving a written notice to Service Provider to terminate pursuant to Article 10.2.

11.3.   <u>Effects of Termination</u>. Upon termination of this Agreement:

(a)     Service Provider shall:

(i)     return the remaining Deposit to BITMAIN including in accordance with Articles 3.4(c)(ii), 3.4(d)(iii) 3.4(f);

(ii)    pay any and all amounts owing to BITMAIN including any Delayed Compensation under Articles 3.4(d)(iii) and 3.5(b), and Monthly Theoretical Hosting Fee under Articles 11.2(d) or 11.2(e);

(iii)   any Balance remaining;

(iv)    provide unfettered access to BITMAIN Personnel to the Data Center Facility and any assistance required by such BITMAIN Personnel to remove the BITMAIN Property;

(v)     issue a final invoice with the applicable Hosting Fee outstanding up to the termination date in accordance with Article 3.6(a); and

(vi)    return all Confidential Information of BITMAIN to BITMAIN and delete all electronic copies thereof from its systems.

(b)     BITMAIN shall:

(i)     pay all finally determined invoice amounts outstanding as of the termination date;

(ii)    remove all the Hosted Servers and Inventory Assets from the Data Center Facilities; and

(iii)   return all Confidential Information of Service Provider to Service Provider and delete all electronic copies thereof from its systems.

11.4.   <u>Survival</u>.

(a)     Neither the expiration nor the termination of this Agreement will release either of the Parties from any obligation or liability that accrued prior to such expiration or termination.

(b)     The provisions of this Agreement requiring performance or fulfillment after the expiration or termination of this Agreement will survive the expiration or termination of this Agreement including Article 8, Article 9, Article 11, Article 12, Article 13, Article 14 and Article 16 and such other provisions as are necessary for the interpretation therefor and any other provisions hereof, the nature and intent of which is to survive termination or expiration of this Agreement.

## 12.   CONFIDENTIALITY

12.1.   From the date of this Agreement until the fifth (5th) year anniversary of the expiry of the Term or the earlier termination pursuant to Article 11.2, each Party hereby agrees that it will, and will cause its Affiliates and its and their respective directors, officers, employees, professional advisors, agents and other Persons acting on their behalf (collectively, "**Representatives**") to hold, in strict confidence the terms and conditions of this Agreement, all exhibits and schedules attached hereto and the Service Order(s), including their existence, and all non-public records, books, contracts, instruments, computer data and other data and information, whether in written, verbal, graphic, electronic or any other form, provided by any other Party and its Representatives (except to the extent that such information has been (a) already in such Party's possession prior to the disclosure or obtained by such Party from a source other than any other Party or its Representatives, provided that, to such Party's knowledge, such source is not prohibited from disclosing such information to such Party or its Representatives by a contractual, legal or fiduciary obligation to any other

**BITMAIN**                                                                                       v5.3

Party or its Representatives, (b) in the public domain through no breach of the confidentiality obligations under this Agreement by such Party, or (c) independently developed by such Party or on its behalf without reference to any such non-public information) (the "**Confidential Information**").

12.2.   Notwithstanding the foregoing, each Party may disclose the Confidential Information (i) to its Affiliates and its and their respective Representatives so long as such persons are subject to appropriate nondisclosure obligations, (ii) as required by applicable Law (including securities Laws and applicable securities exchanges rules) or requests or requirements from any Governmental Authority or other applicable judicial or Governmental Order, or (iii) in connection with any enforcement of, or dispute with respect to or arising out of, this Agreement, or (iv) with the prior written consent of the other Party.

12.3.   The content of this Agreement and any information disclosed hereunder by the other Party in the course of negotiating or performing this Agreement is Confidential Information under this Agreement and shall only be used in accordance with this Agreement.

**13.    INJUNCTIVE RELIEF**

13.1.   Service Provider acknowledge that a breach or threatened breach of this Agreement shall cause serious and irreparable harm to BITMAIN for which monetary damages alone would not be a sufficient remedy. Accordingly, Service Provider agrees that in the event of a breach or threatened breach by the Service Provider, BITMAIN shall be entitled to injunctive relief and specific performance in addition to any other remedy available to BITMAIN in equity or at law without the necessity of obtaining any form of bond or undertaking whatsoever, and Service Provider hereby waives any claim or defense that damages may be adequate or ascertainable or otherwise preclude injunctive relief.

**14.    NOTICES**

14.1.   All notices, requirements, requests, claims, and other communications in relation to this Agreement shall be in writing, and shall be given or made by delivery in person, by an internationally recognized overnight courier service, by registered or certified mail (postage prepaid, return receipt requested) or electronic mail to the respective Parties at the addresses specified below or at such other address for a Party as may be specified in a notice given in accordance with this Article 14.1. Any such notice or other communication shall be deemed to have been given and received on the day on which it was delivered or transmitted (or, if such day is not a Business Day, on the next following Business Day).

14.2.   The following are the initial address of each Party:

**If to Service Provider:**

BITMAIN

Address:      4350 Semple Avenue, St. Louis, MO, 63120

Attn:         Jiawei Zhang

Email:        jiawei_zhang@hotmail.com

**If to BITMAIN:**

Address:   900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076, USA

Attn:         Legal Department

Email:        legal@bitmain.com

## 15.   ANTI-COMMERCIAL BRIBERY

15.1.   Service Provider shall not, and shall procure its directors, officers, employees, consultants, agents and other representatives (collectively with Service Provider, the "**Service Provider Associates**") not to, directly or indirectly engage in any activity of commercial bribery, i.e. providing any unjustified interests in any form including but not limited to cash, cheque, credit card gifts, negotiable securities (including bonds and stocks), physical objects (including all kinds of high-end household goods, luxury consumer goods, handicrafts and collections, as well as housing, vehicles and other commodities), entertainment coupon, membership card, currency or rebate in the form of goods, kickback, non-property interests such as schooling, honor, special treatment, and employment for relatives and friends, traveling, entertaining and personal service etc. to any director, officer, employee, consultant, agent and other representative of BITMAIN (collectively, "**BITMAIN Associates**")in order to obtain the any immediate or future business opportunity with BITMAIN whether under this Agreement or any other business relationship, regardless of whether such unjustified interests is provided on Service Provider Associates' own initiative or in response to explicit or implicit request of BITMAIN Associates.

15.2.   If any of BITMAIN Associates explicitly or implicitly requests commercial bribes, Service Provider shall immediately notify BITMAIN of such activity with relevant evidence and cooperate with BITMAIN in its investigation.

15.3.   If any of Service Provider Associates commits commercial bribes in contravention of Article 15.1, BITMAIN shall be entitled to terminate this Agreement and any other existing business cooperation with Service Provider and claim for damages against Service Provider.

## 16.   GENERAL

16.1.   Entire Agreement and Amendment. This Agreement, together with all Services Orders, appendixes, schedules, annexes and exhibits, constitute the full and entire understating and agreement between the Parties, and supersede all other agreements

**BITMAIN**                                                                    v5.3

between or among any of the Parties with respect to the subject matters hereof and thereof. This Agreement may only be amended with the written consent of both Parties or otherwise as mutually agreed by both Parties.

16.2.  <u>Assignment</u>.

    (a)    BITMAIN may freely assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part to its Affiliates or to any third party.

    (b)    Service Provider may assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part subject to BITMAIN's prior written consent.

    (c)    This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

16.3.  <u>Governing Law</u>. This Agreement shall be solely governed by and construed in accordance with the laws of the Relevant Jurisdiction, without regard to principles of conflict of laws.

16.4.  <u>Dispute Resolution</u>. All disputes arising under this Agreement shall be submitted to arbitration in Houston, Texas before a single arbitrator of the American Arbitration Association ("**AAA**"). The arbitrator shall be selected by application of the rules of the AAA, or by mutual agreement of the parties, except that such arbitrator shall be an attorney admitted to practice law in the Relevant Jurisdiction. No party to this agreement will challenge the jurisdiction or venue provisions as provided in this section. No party to this agreement will challenge the jurisdiction or venue provisions as provided in this section. Nothing contained herein shall prevent the party from obtaining an injunction. The breaching Party shall bear the attorney fees and arbitration fees of the non-breaching Party. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY.

16.5.  <u>Severability</u>. In case any provision of the Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. If, however, any provision of this Agreement shall be invalid, illegal or unenforceable under any Applicable Law in any jurisdiction, it shall, as to such jurisdiction, be deemed modified to conform to the minimum requirements of such Applicable Law, or, if for any reason it is not deemed so modified, it shall be invalid, illegal or unenforceable only to the extent of such invalidity, illegality or limitation on enforceability without affecting the remaining

BITMAIN

v5.3

provisions of this Agreement, or the validity, legality or enforceability of such provision in any other jurisdiction.

16.6.  <u>Counterparts</u> This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile and e-mailed copies of signatures shall be deemed to be originals for purposes of the effectiveness of this Agreement.

*[The remainder of this page is intentionally left blank for signature]*



v5.3

**APPENDIX I**
**FORM OF SERVICE ORDER**

Date: March 1st, 2023
Ref. Number: BMHS2023010-01

This is a Service Order under the Service Framework Agreement dated March 1st, 2023 (the "**Service Framework Agreement**") between **BITMAIN TECHNOLOGIES GEORGIA LIMITED**, a corporation incorporated under the laws of the State of Georgia of the United States of America (File No. 21203283), having its registered office at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076, USA ("**BITMAIN**") and **JWKJ Technologies LLC**, a corporation incorporated under the laws of the State of Florida of the United States of America (File No. L22000077767), having its registered office at 5060 W Colonial Drive. #113, Orlando, Florida, 32808 ("Service Provider"). Unless otherwise specified, capitalized terms used herein shall have the same meaning as those defined in the Service Framework Agreement.

1. **DATA CENTER FACILITY**

   This Service Order is corresponding to the Information Memorandum of Data Center Facility submitted by the Service Provider on February 25, 2023 with the reference number of BMHS2023010-01 attached hereto as EXHIBIT A (the "**Corresponding Memo**") as well as the Data Center Facility as described in the Corresponding Memo located at 4350 Semple Avenue, St. Louis, MO, 63210.

2. **HOSTING CAPACITY AND HOSTED SERVERS**

2.1. Under this Service Order, Service Provider agrees to provide to BITMAIN Hosting Capacity as follows, together with the necessary onsite production and living facilities including office rooms, maintenance rooms, canteen, dormitory and toilets. The number of the Hosting Quantity shall be determined based on the calculation of each Hosted Server's power as 3,600W.

| Batch No. | Hosting Capacity (MW) | Hosting Quantity (Units) | Estimated Power-on Date |
|-----------|----------------------|--------------------------|------------------------|
| 1 | 4 | 1,000 | March 15, 2023 |
| 2 | 12 | 3,200 | April 15, 2023 |
| 3 | 7 | 1,800 | May 15, 2023 |
| In Total | 23 | 6,000 | - |

Service Provider shall ensure that the Data Center Facility has been connected to electrical power and reaches its standard operational conditions for each batch of Hosted Servers to be in Online Status on or before the respective estimated power-on date as set forth in the table above. For avoidance of doubt, the Parties agree and acknowledge that if this Service Order is the first Service Order under the Service



v5.3

Framework Agreement, the estimated power-on date of the first (1ˢᵗ) batch shall be the Initial Date referred to in the Service Framework Agreement.

2.2.   Details of the Hosted Servers hereunder are as follows, subject to the specific model, rated hashrate, rated power and quantity of the Hosted Servers actually delivered to the Data Center Facility:

| Batch No. | Model | Rated Hashrate (T) | Rated Power (kW) | Hosting Capacity (MW) | Hosting Quantity (Units) | Estimated Arrival Date |
|---|---|---|---|---|---|---|
| 1 | S19XP Series | TBD | 3.6 | 4 | 1,000 | March 15, 2023 |
| 2 | S19XP Series | TBD | 3.6 | 12 | 3,200 | April 15, 2023 |
| 3 | S19XP Series | TBD | 3.6 | 7 | 1,800 | May 15, 2023 |
| In Total | - | - | - | 23 | 6,000 | - |

## 3.   SERVICE AND FEES

3.1.   <u>Deposit</u>. Within seven (7) Business Days from each date Service Provider has provided BITMAIN with documentation reasonably demonstrating that it is reasonable to have the Data Center Facility connected to electrical power in respect of the respective batch of the Hosted Servers based on the construction progress and that the construction of the Data Center Facility is progressing to BITMAIN's satisfaction, BITMAIN shall pay to Service Provider the Deposit as set forth below:

| Batch No. | Hosting Quantity (Units) | Deposit Breakdown | Deposit (US$) | Estimated Payment Date |
|---|---|---|---|---|
| 1 | 1,000 | 1,000 × 3.6 (kW) × US$ 0.073 × 24 ×30 | 189,216.00 | TBD |
| 2 | 3,200 | 3,200 × 3.6 (kW) × US$ 0.073 × 24 ×30 | 605,491.20 | TBD |
| 3 | 1,800 | 1,800 × 3.6 (kW) × US$ 0.073 × 24 ×30 | 340,588.80 | TBD |
| In Total | 6,000 | - | 1,135,296.00 | - |

3.2.   <u>Hosting Fees</u>. The applicable Hosting Fee under this Service Order are as follows:

Normal   Hosting   Unit   Price   (including   non-deductible   taxes/expenses): US$ 0.073/kWh



v5.3

Minimum Hosting Unit Price (including non-deductible taxes/expenses): US$ 0.065/kWh

Monthly Theoretical Hosting Fee (including non-deductible taxes/expenses): $\sum$Rated Power of Each Hosted Server Powered-On (kW) × Normal Hosting Unit Price × 24× 30

3.3.  <u>Other Fees</u>. BITMAIN shall pay the following fees as per use, provided that these fees may be incurred only after prior written approval of BITMAIN:

(a)  On-rack fee: US$ 20 per Hosted Server

(b)  De-rack fee: US$ 20 per Hosted Server

(c)  Others (please specify): [N/A]

3.4.  <u>Taxes and Expenses</u>.

Pursuant to the prevailing tax regulation of the State of Missouri, the services provided by the Service Provider or the payment of any amounts made by BITMAIN are not subject to tax including but limited to sales and use tax, valued added tax and any other governmental charges and duties similar to the tax, hence the Service Provider shall not charge any additional taxes in relation to the services rendered under this agreement. If the tax regulation of the State of Missouri changes, the taxes and expenses may be agreed and confirmed in writing by the Parties otherwise.

**4.  BILLING AND PAYMENT**

4.1.  The Prepayment is estimated to be paid as follows, subject to the quantity of the Hosted Servers powered-on as confirmed by documentation provided by Service Provider and the date of provision of such documentation by Service Provider:

| Batch No. | Rated Power (kW) | Hosting Quantity (Units) | Estimated Prepayment Breakdown | Estimated Prepayment Amount (US$) |
|---|---|---|---|---|
| 1. | 4 | 1,000 | 3.6 (kW) × 1,000 × US$ 0.073 × 24 × 30 | 189,216.00 |
| 2. | 12 | 3,200 | 3.6 (kW) × 3,200 × US$ 0.073 × 24 × 30 | 605,491.20 |
| 3. | 7 | 1,800 | 3.6 (kW) × 1,800 × US$ 0.073 × 24 × 30 | 340,588.80 |
| In Total | 23 | 6,000 | - | **1,135,296.00** |

4.2. All payment of Hosting Fee under this Service Order, including any remittance or refund of Hosting Fee, shall be made:



v5.3

☒ via wire transfer of immediately available funds in the US Dollars to the bank account of designated by the receiving Party; or

☐ via other methods: _____.

The Parties agree that, in the event that Service Provider fails to provide or update (if applicable) the correct and the latest valid payment information of Service Provider, Service Provider shall not suspend provision of Services, terminate the Service Framework Agreement or this Service Order, or hold BITMAIN liable for any breach of contract for failure of BITMAIN to make payment due thereto.

4.3.   Account Information of Service Provider

Account Name: JWKJ Technologies LLC
Beneficiary Bank Name: ▮▮▮▮▮▮
Bank Address: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Account Number: ▮▮▮▮▮
Routing Number: ▮▮▮▮▮▮
SWIFT CODE: ▮▮▮▮▮▮▮

## 5.   TERM AND TERMINATION OF SERVICE ORDER

5.1.   This Service Order shall be effective from the date hereof and expire on the expiry or early termination of the Service Framework Agreement.

5.2.   This Service Order may be terminated prior to its expiry:

(a)   upon mutual agreement in writing of the Parties;

(b)   upon BITMAIN giving a written notice to Service Provider if the Data Center Facility fails to meet its standard operational conditions of the respective Hosting Capacity for the Hosted Servers to be in Online Status within thirty (30) calendar days after the estimated power-on date set forth in paragraph 2.1 of this Service Order; meanwhile, BITMAIN shall not be liable to pay Service Provider any fee, charges or expenses during the period of such operational conditions;

(c)   upon Service Provider giving a written notice to BITMAIN if BITMAIN fails to deliver the first batch of Hosted Servers within thirty (30) calendar days from (i) the estimated arrival date set forth in paragraph 2.2 of this Service Order, or (ii) the actual date on which the Data Center Facility meets the standard operational conditions of the respective Hosting Capacity, whichever is later; and

(d)   upon either Party giving a written notice of no less than sixty (60) calendar days to the other Party, *provided that* a compensation in an amount equal to



Monthly Theoretical Hosting Fee shall be paid by this Party to such other Party upon termination.

5.3.    Upon expiry or early termination of this Service Order, Service Provider shall:

(a)    in any event no later than five (5) Business Days from the expiry or early termination, issue the invoice of the Hosting Fee for the unpaid Billing Period, with the Reconciliation Statement for such unpaid Billing Period and the supporting documents proving the Power Consumption for the such Billing Period (e.g., photos of the Separate Meter showing the Power Consumption at the end of such Billing Period) as attachments to the invoice in accordance with Article 3.6(a) of the Service Framework Agreement; and

(b)    issue to BITMAIN the updated invoice(s) of the Hosting Fees for the unpaid Billing Period(s) in accordance with Articles 3.6(b)(ii) and 3.6(b)(iii) of the Service Framework Agreement (if applicable).

5.4.    Settlement of Last Invoice

BITMAIN shall make payment(s) to Service Provider to settle the outstanding amount in the invoice for the unpaid Billing Period(s) in accordance with Article 3.6(b) of the Service Framework Agreement (if applicable).

**6.    PREVAILING PROVISION**

In the event of any discrepancy between the provision of this Service Order and the Service Framework Agreement, the provision in this Service Order shall prevail.

*[The remainder of this page is intentionally left blank for signature]*

# BITMAIN

v5.3

## EXHIBIT A
### INFORMATION MEMORANDUM OF DATA CENTER FACILITY

Service Provider: JWKJ Technologies LLC
Submission Date: 02/25/2023
Ref. Number: BMHS2023010-01

| BASIC INFORMATION | | | | | | |
|---|---|---|---|---|---|---|
| Location | 4350 Semple Avenue, St. Louis, MO, 63210 | | | | | |
| Jurisdiction | State of Missouri | | | | | |
| Land Area (sq. m) | 4830.96 | | | | | |
| Building Area (sq. m) | 37845.82 | | | | | |
| Construction Structure | ☐ Steel Structure   ☒ Warehouse   ☐ Container | | | | | |
| Designed No. of Racks | 200 | | | | | |
| Heat Dissipation Method | ☐ Hydro Cooling ☒ Air Cooling | | | | | |
| Local Temperature (℃) | Max. | 38 | Min. | -15 | Avg. | 15 |
| Server Air Inlet Temperature (℃) | Max. | N/A | Min. | N/A | Avg. | N/A |
| Humidity (%) | 65 | | | | | |
| Air Pressure (kPa) | N/A | | | | | |
| **ELECTRICAL POWER** | | | | | | |
| Power Type | ☒Grid hybrid ☐ Wind ☐ Solar ☐ Hydro ☐ Nuclear | | | | | |
| Electricity Cost (US$ / kWh) | US$ 0.065/kWh | | | | | |
| Max. Power Capacity (MW) | 25 MW | | | | | |
| Minimum Power Commitment | ☐ Not Available<br><br>☒ 10 MW | | | | | |
| **NETWORK** | | | | | | |
| Network Operator | AT&T | | | | | |
| Network Bandwidth, Mb/s | 500 | | | | | |
| **COMPLIANCE STATUS** | | | | | | |
| Project Approval Documents | ☐ Not Available<br><br>☒ Provided to BITMAIN on 01/09/2023 | | | | | |

# BITMAIN

v5.3

| Power Purchase Agreement(s) | ☐ Not Available <br><br> ☒ Provided to BITMAIN on 02/16/2023 |
|---|---|
| Land Title Document | ☐ Not Available <br><br> ☐ Land Ownership Certificate OR ☒ Lease Agreement <br><br> OR ☐ Land License Agreement provided to BITMAIN on 02/06/2023 |
| Ultimate Beneficiary Owner of Data Center Facility[2] | Jiawei Zhang |
| **OTHER INFORMATION** | |
| | |

---

[2] Please indicate the ultimate beneficial owner who is either (i) an individual, or (ii) a company listed on a qualified stock exchange.

# BITMAIN

v5.3

**IN WITNESS WHEREOF**, the undersigned have executed this Service Order on the date first written above.

Signed for and on behalf of BITMAIN

**BITMAIN    TECHNOLOGIES    GEORGIA LIMITED**

Signature_____
Name:_____
Title:_____

Signed for and on behalf of Service Provider

**JWKJ Technologies LLC**

Signature_____
Name: Jiawei Zhang
Title: Director

BITMAIN

v5.3

## APPENDIX II
### FORM OF RECONCILIATION STATEMENT

| Hosting Capacity 矿场容量 (MW) | Actual Hosting Quantity 实际托管数量 (Units) | Billing Period 计费周期 | Power Consumption 耗电量 (kW) | Online Status Ratio 在线率 | Actual Hosting Unit Price 实际托管单价(US$) | Total Hosting Fee 总费用(US$) |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

**BITMAIN**

v5.3

## APPENDIX III
## FORM OF CONFIRMATION OF HOSTED SERVERS SECURITY

Service Provider: JWKJ Technologies LLC

Submission Date: [               ]

| Date | Service Order Ref. Number | Hosting Quantity (Units) | Site* | Model | Hashrate (T/Hs) | Sub-account Name | Online Quantity* (Units) (B) | Power-shortage Quantity* (Units) (C) | Maintenance Quantity* (Units) (D) | Total Quantity (Units) (A) = (B) + (C) + (D) |
|------|------|------|------|------|------|------|------|------|------|------|
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
| **In Total** |  |  |  |  |  |  |  |  |  |  |

*\* Note:*

1. *For "**Site**", please indicate the exact building of the Data Center Facility where the corresponding Hosted Servers are stored and operated.*
2. *Definitions*
1) *"Hosting Quantity" means number of the Hosted Servers hosted in the Data Center Facility;*
2) *"Online Status" means the status of a Hosted Server that is powered-on with constant supply of electrical power, has stable connection with network and is accessible.   For the "Online Quantity", please indicate the number of Hosted Servers in Online Status counted on the submission date of this Confirmation of Hosted Servers Security.*
3) *"Power-shortage Status" means the status of a Hosted Server which has been delivered to the Data Center Facility that (a) is not powered-on yet, or (b) experiences power outage for a consecutive of twenty-four (24) hours or more after being powered-on, and is not in Maintenance Status (as defined below). For the "Power-shortage Quantity", please indicate the number of Hosted Servers in Power-shortage Status counted on the submission date of this Confirmation of Hosted Servers Security.*

# BITMΛIN

v5.3

> 4)  *"Maintenance Status"* means the status of a Hosted Server that is experiencing defect, failure or malfunction, and has been de-racked pending maintenance or under maintenance. For the *"Maintenance Quantity"*, please indicate the number of Hosted Servers in Maintenance Status counted on the submission date of this Confirmation of Hosted Servers Security.

To ensure the healthy and long-term mutual cooperation and maintain business relationships with ordinary interest between the Parties, the Service Provider hereby certifies that none of the events described below have occurred and are continuing and none of the circumstances described below exist  except as identified below in which case the details of each event or circumstance are set forth below in reasonable detail:

| | | | |
|---|---|---|---|
| 1. | Insolvency or bankruptcy proceedings initiated or threatened | ☐ Yes | Please specify the details: |
| | | ☐ No | / |
| 2. | Material judgments against Service Provider | ☐ Yes | Please specify the details: |
| | | ☐ No | / |
| 3. | Material asset reorganization of Service Provider | ☐ Yes | Please specify the details: |
| | | ☐ No | / |
| 4. | Material dispute, claim, litigation or arbitration involving Service Provider | ☐ Yes | Please specify the details: |
| | | ☐ No | / |
| 5. | Other circumstance that has had, has, or could reasonably be expected to have a material adverse effect on the business of the Service Provider | ☐ Yes | Please specify the details: |
| | | ☐ No | / |



v5.3

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement on the date first written above.

Signed for and on behalf of BITMAIN

**BITMAIN    TECHNOLOGIES    GEORGIA LIMITED**

Signature程然

Name:_____

Title:_____

Signed for and on behalf of Service Provider

**JWKJ Technologies LLC**

Signature_____

Name: Jiawei Zhang

Title: Director

