UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| _____ ) | |
| BITMAIN TECHNOLOGIES GEORGIA ) LIMITED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 4:24-cv-00927-HEA |
| ) | |
| JWKJ TECHNOLOGIES LLC, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND COMPEL ARBITRATION

Plaintiff Bitmain Technologies Georgia Limited ("Bitmain") submits this Opposition to Defendant JWKJ Technologies LLC's ("JWKJ's") Motion to Dismiss and Compel Arbitration (ECF No. 13) (the "Motion").

## PRELIMINARY STATEMENT

Rather than responding to Bitmain's Motion for a Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery (ECF No. 3) (the "TRO Motion"), mere hours before the Court was set to hear oral arguments on Bitmain's TRO Motion, JWKJ submitted its own Motion, seeking to dismiss this entire action. It soon became apparent that JWKJ's Motion was a last-ditch effort to prevent the Court from learning the full extent of JWKJ's malfeasance, conduct which JWKJ's counsel admits is "problematic." (Transcript of July 15, 2024 Hearing (hereinafter "Hr. Tr."), attached as **Exhibit 1**, at 25:25.) At the July 15, 2024 Hearing on Bitmain's TRO Motion (the "Hearing"), JWKJ's counsel admitted that JWKJ has used Bitmain's stolen property to mine bitcoin, unjustly enriching itself in the process. (*Id.* at 19:16-20.) JWKJ admitted

that Bitmain has the right to remove its property from JWKJ's data center, though the Parties dispute when that removal should occur. JWKJ admitted that its refusal to allow Bitmain to remove its property from JWKJ's data center is because JWKJ needs to continue to illegally operate Bitmain's bitcoin miners[1] at the data center to satisfy its obligations towards other parties. With facts such as these, which justify the Temporary Restraining Order ("TRO") Bitmain seeks, JWKJ's fear that the Court would go forward with the Hearing is understandable.

As an initial matter, Bitmain agrees with JWKJ that the merits of its claims against JWKJ should be decided in arbitration, per the Service Framework Agreement ("SFA"), the contract governing the relationship between Bitmain and JWKJ. Bitmain disagrees, however, with JWKJ's contention that this Court does not have jurisdiction to issue a Temporary Restraining Order preventing JWKJ from continuing its theft of Bitmain's property. JWKJ's argument ignores two provisions in the SFA that allow Bitmain to seek injunctive relief. The first, Article 13.1 provides that Bitmain may seek an injunction to prevent breaches of the SFA. Article 13.1 makes clear that this relief is in addition to, not alongside, the relief Bitmain may seek via arbitration. The other provision, Article 16.4, specifically provides that the Parties' general agreement to arbitrate claims under the SFA should not be an impediment to Bitmain securing an injunction. Accordingly, Bitmain is not bound to seek an injunction via arbitration.

Nor would issuing the Temporary Restraining Order that Bitmain seeks require the Court to resolve the merits of Bitmain's dispute with JWKJ. Bitmain's claims against JWKJ are that JWKJ breached its post-termination obligations, including payment of liquidated damages and that JWKJ unlawfully manipulated Bitmain's Hosted Servers to mine bitcoin for JWKJ's benefit.

---

[1] Throughout this opposition, Bitmain refers to the 3,407 bitcoin miners that are the subject of its TRO Motion as the "Hosted Servers," the terminology used in the SFA.

Bitmain understands from correspondence with JWKJ that JWKJ may assert counterclaims relating to disputed invoice payments. Although Bitmain's conversion and declaratory judgment claims relate to the ownership of the Hosted Servers, the Court may nevertheless issue an injunction allowing Bitmain to take possession of the Hosted Servers because under the unambiguous language of the SFA, the Hosted Servers are Bitmain's property. JWKJ can point to no provision of the SFA that restricts Bitmain's ability to remove its own property from JWKJ's data center. Nor does JWKJ dispute Bitmain's ownership of the Hosted Servers. Bitmain merely asks that the Court issue an order requiring JWKJ to comply with the plain language of the SFA and recognize Bitmain's right to possess its property while the arbitrator determines the merits of the Parties' claims.

Bitmain asks the Court to 1) issue a Temporary Restraining Order preventing JWKJ from interfering with Bitmain's right to possess the Hosted Servers, 2) compel arbitration of Bitmain's claims against JWKJ and any counterclaims JWKJ may bring against Bitmain, and 3) maintain jurisdiction over this matter during the pendency of Bitmain's arbitration to enforce the Temporary Restraining Order.

## ARGUMENT

### I. The Court Has Jurisdiction to Enter a Temporary Restraining Order Requiring JWKJ to Cease Its Theft of Bitmain's Property.

#### A. The SFA Specifically Allows Bitmain to Seek an Injunction.

The Eighth Circuit recognizes that "[i]t is a 'fundamental principle that arbitration is a matter of contract." *Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 873 (8th Cir. 2018) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). As a result, "'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Id.* (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). In executing the SFA, Bitmain

and JWKJ explicitly left open the possibility that the Parties could seek injunctive relief from a court, so Bitmain cannot now be forced to submit its request for a TRO to the exclusive jurisdiction of an arbitrator.

The SFA explicitly allows Bitmain to pursue an injunction as a remedy to JWKJ's breach of the SFA. Article 13.1 provides as follows:

> Service Provider [i.e., JWKJ] acknowledge[s] that a breach or threatened breach of this Agreement shall cause serious and irreparable harm to BITMAIN for which monetary damages alone would not be a sufficient remedy. Accordingly, **Service Provider agrees that in the event of a breach or threatened breach by the Service Provider, BITMAIN shall be entitled to injunctive relief** and specific performance **in addition to any other remedy available to BITMAIN in equity or at law** without the necessity of obtaining any form of bond or undertaking whatsoever, and Service Provider hereby waives any claim or defense that damages may be adequate or ascertainable or otherwise preclude injunctive relief.

Ex. A, Article 13.1. By its plain language, Article 13.1 supplements other rights that Bitmain has under the SFA. To read this provision as merely reiterating that Bitmain may receive injunctive relief in arbitration, as JWKJ urges the Court to do, would ignore the parties' intent that injunctive relief under Article 13.1 be "in addition to any other remedy available to BITMAIN in equity or at law." The Court should instead give effect to the Parties' agreement and allow Bitmain to pursue immediate injunctive relief in this Court, in addition to the compensatory damages it will seek in arbitration.

Article 13.1 works in tandem with Article 16.4. Although the SFA relegates most disputes arising under the SFA to arbitration, the Parties made explicit that by choosing arbitration they did not intend to limit their ability to seek injunctive relief from courts. Article 16.4, the article concerning dispute resolution, provides that "[n]othing contained herein shall prevent the party from obtaining an injunction." Ex. A, Article 16.4. A decision that Article 16.4's delegation of disputes to arbitration bars Bitmain from seeking a TRO would violate the plain language of Article 16.4 and thus the Parties' intention in drafting the SFA.

4

JWKJ's argument that Article 16.4 should be read as simply reaffirming the AAA Commercial Rules' allowance for injunctions would render the injunction carve-out in Article 16.4 superfluous, violating a well-established canon of contractual construction.[2] It is a "general principle of contract construction that no provision of a contract should be interpreted in a manner that would render it surplusage." *Dunne v. Libbra*, 330 F.3d 1062, 1063 (8th Cir. 2003). But that is precisely what JWKJ's reading of Article 16.4 would do. AAA Commercial Rule 38(a) allows an arbitrator to "take whatever interim measures he or she deems necessary, including injunctive relief." In light of the SFA's incorporation of the AAA Commercial Rules, under JWKJ's reading, Article 16.4 would simply repeat what AAA Commercial Rule 38(a) already states. The better approach is to adopt an interpretation that does not render portions of Article 16.4 surplusage and read it to preserve rights beyond those already provided in the AAA Commercial Rules.

The unpublished cases from other judges in this District that JWKJ cites in support of its Motion are readily distinguishable. District Judge Catherine D. Perry in *Diabetic Care RX, LLC v. Express Scripts, Inc.* considered an arbitration provision that did not mention injunctive relief at all. No. 4:18 CV 1176 CDP, 2018 WL 3643550, at *1 (E.D. Mo. Aug. 1, 2018). Likewise, the arbitration provision that District Judge Ronnie L. White considered in *Kane Int'l Corp. v. US Polymers-Accurez LLC* provided that the parties agreed to resolve a "major disagreement that we

---

[2] The Parties have chosen to have the merits of their dispute resolved under the American Arbitration Association's ('AAA') Commercial Rules. Ex. A, Article 16.4 ("All disputes arising under this Agreement shall be submitted to arbitration in Houston, Texas before a single arbitrator of the American Arbitration Association ('AAA')."); AAA Commercial Rule R-1(a) ("The parties shall be deemed to have made these Rules a part of their arbitration agreement whenever they have provided . . . for arbitration by the AAA of a domestic commercial dispute without specifying particular rules."). In its Motion, JWKJ appears to agree with the application of the AAA Commercial Rules to the Parties' arbitration. (*See* Mot. at 9, fn. 8.)

can not [sic] work out among ourselves . . . in Arbitration" and again made no mention of injunctive relief.  No. 4:17CV1625RLW, 2017 WL 2693500, at *1 (E.D. Mo. June 21, 2017).

Under the plain language of Articles 13.1 and 16.4, Bitmain and JWKJ did not intend their submission of disputes arising under the SFA to restrict their right to pursue injunctive relief from a court in aid of the arbitration.

**B.    Issuing a Temporary Injunction Will Not Require the Court to Reach the Merits of Bitmain's Case Against JWKJ.**

JWKJ's argument that an arbitrator is in a better position to evaluate the merits of Bitmain's claims mischaracterizes the issue before the Court.  There is no dispute between the parties that the underlying merits should and will be decided by an arbitrator.  Bitmain simply requests that the Court exercise its ability to grant injunctive relief—a request that has nothing to do with the underlying merits and everything to do with Bitmain's right to control and possess its miners.  This right lies with Bitmain as the undisputed owner of the miners.

The issue before the Court is whether it has jurisdiction to grant the requested injunctive relief to Bitmain.  Courts in the Eighth Circuit may grant injunctive relief even where the parties have generally agreed to submit their disputes to arbitration if there is "qualifying contractual language," which means "language which provides the court with clear grounds to grant relief without addressing the merits of the underlying arbitrable dispute."  *Peabody Coalsales Co. v. Tampa Elec. Co.*, 36 F.3d 46, 48 (8th Cir. 1994).  The SFA contains such qualifying contractual language.  Under the plain language of Article 8.1, "Service Provider [i.e., JWKJ] acknowledges and agrees that the Hosted Servers [i.e., the miners] . . . are assets of BITMAIN."  Ex. A, Article 8.1.  Moreover, JWKJ's admissions at the July 15, 2024 Hearing also make clear that Bitmain's right to possession of the miners is not in dispute.  JWKJ did not dispute that it has stolen the use of Bitmain's miners by using them to mine Bitcoin for its own account.  (Hr. Tr. at 19:16–20.)

6

JKWJ admits that its dispute with Bitmain over invoices "doesn't justify some of [JWKJ's] activity" in detaining the Hosted Servers. (*Id.* at 23:9.) The Court may give effect to the "qualifying contractual language" in the SFA and grant Bitmain possession of the property that JWKJ does not—and cannot—dispute that Bitmain owns.

### C.    The Court May Rule on the Scope of the Arbitration Provision.

JWKJ's contention that the AAA Commercial Rules prevent the Court from deciding the scope of the Parties' arbitration provision plays fast and loose with the language of the Commercial Rules. JWKJ cites Rule 7(a), which provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction." Although this Rule empowers the arbitrator to rule on jurisdictional questions, the Rule does not grant the arbitrator the *sole* power to rule on the scope of the Parties' arbitration agreement. An agreement that once arbitration has commenced the arbitrator will have the power to rule on jurisdictional questions does not limit the Court's ability to rule on such questions before the arbitration begins.

JWKJ's reliance on *Fallo v. High-Tech Institute,* 559 F.3d 874, 878 (8th Cir. 2009), is similarly misplaced. Although the Eighth Circuit in *Fallo* concluded that by incorporating the AAA Commercial Rules, the parties intended to leave all questions of arbitrability to the arbitrator, there are critical differences between the circumstances in *Fallo* and in this action. The district court in *Fallo* had denied the defendant's motion to compel arbitration of the plaintiffs' tort claims. *Id.* at 878. In doing so, the district court wholly prevented the arbitrator from exercising jurisdiction over the merits of the tort claims and reserved judgment on the merits of those claims for itself. In contrast, by issuing a TRO in this action, the Court would not prevent the arbitrator from later ruling on the merits of any of Bitmain's claims.[3]

---

[3] The AAA Commercial Rules demonstrate the compatibility of the TRO Bitmain seeks from the Court and final adjudication of the merits of Bitmain's case in arbitration. Rule 38(c) provides

## II.    The AAA Commercial Rules Do Not Afford Bitmain the Immediate Relief That This Court May Grant.

Forcing Bitmain to seek injunctive relief in arbitration—which it is not required to do under the SFA—would only prolong JWKJ's theft of Bitmain's property.  Although AAA Commercial Rule 39 allows parties to seek emergency relief before the AAA, such relief is not immediate.  The AAA must still appoint an arbitrator, whose appointment the parties may challenge.  Although this appointment process is only intended to last less than a week, the Commercial Rules do not require the emergency arbitrator to move forward within any time period.  *See* AAA Commercial Rule 39(d).  Even if the arbitrator rules expeditiously, which is not a given, Bitmain still must either depend on JWKJ's good faith to comply with the ruling or must seek to confirm that ruling in federal court.

Bitmain has no confidence—nor should the Court—that JWKJ will accede to an adverse decision by an emergency arbitrator.  JWKJ has already shown that it willing to steal from Bitmain.  During the Hearing, JWKJ attempted to defend its conduct by stating that although that it had used Bitmain's Hosted Servers to mine bitcoin for its own account, it "is no longer mining" and "has not sold anything that it has mined."  (Hr. Tr. 19:16–18.)  JWKJ's assurance that it may have stolen from Bitmain in the past, but it promises not to do so again does not reassure Bitmain.  JWKJ has admitted that it has no right to the Hosted Servers but refuses to give them back to Bitmain.  Should JWKJ refuse to comply with any order of the arbitrator, Bitmain would have to petition a federal court to confirm the arbitrator's order pursuant to 9 U.S.C. § 9, delaying relief.  JWKJ could further delay this process by attempting to vacate the arbitrator's order under 9 U.S.C. § 10.  It gives Bitmain cold comfort to think that after the delay of appointing an emergency arbitrator and having

---

that "[a] request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate."

its motion heard, it could have to return to court to enforce an order of the arbitrator if JWKJ continues its pattern of malfeasance. During that delay, JWKJ will have the opportunity to violate Bitmain's property rights by using Bitmain's proprietary technology to mine bitcoin. Because the Hosted Servers are sophisticated, high-tech computers that require professional, continuous operation and maintenance to achieve optimal performance, there is a significant risk that JWKJ's unauthorized operation of the miners would cause irreparable damage to the miners. In contrast, any order that the Court issues here would be immediately enforceable, and JWKJ would immediately expose itself to the risk of sanctions if it were to defy such an order.

By issuing a TRO, the Court would give Bitmain immediate relief from JWKJ's theft and would short-circuit any attempt by JWKJ to use procedural gamesmanship to continue to interfere with Bitmain's property rights.

## III. The Court Should Stay, Not Dismiss This Action While the Arbitration is Pending.

If the Court compels the Parties to arbitrate the merits of their claims, the Supreme Court's recent decision in *Smith v. Spizzirri*, 601 U.S. 472 (2024), requires the Court to stay, rather than dismiss, this action. The Court in *Smith* considered the precise question presented here: "whether [9 U.S.C.] § 3 permits a court to dismiss the case instead of issuing a stay when the dispute is subject to arbitration and a party requests a stay pending arbitration." *Id.* at 474. The Supreme Court unanimously concluded "[i]t does not." *Id.* The Court must therefore stay this action, rather than dismissing it while Bitmain's arbitration of the merits of its dispute against JWKJ moves forward.

<u>CONCLUSION</u>

As Bitmain has demonstrated in its TRO Motion, this Opposition, and the Hearing, there is a pressing need for the Court to enter a TRO preventing JWKJ from continuing to steal Bitmain

Hosted Servers.  This Court has the power to protect Bitmain's property rights and to require JWKJ to abide by the terms of its contract with Bitmain.  Dismissing this case and requiring Bitmain to pursue injunctive relief via arbitration is not required by the Parties' contract and would be unjust. Bitmain accordingly requests that the Court enter an order requiring JWKJ to cease interfering with Bitmain's right to possession of the Hosted Servers and maintain jurisdiction over this action to enforce compliance with such order while the Parties resolve the merits of their dispute in arbitration.

DATED: July 17, 2024

> Respectfully submitted,
>
> SHANK & HEINEMANN, LLC
>
> By: */s/ Christopher S. Shank*
> Christopher Shank, MO Bar # 28760
> Shank & Heinemann, LLC
> 1968 Shawnee Mission Parkway, Suite 100
> Mission Woods, KS 66205
> Telephone: 816-471-0909
> Facsimile:  816-471-3888
> chris@shanklawfirm.com
>
> Matthew G. Lindenbaum, *pro hac vice*
> NELSON MULLINS RILEY & SCARBOROUGH LLP
> One Financial Center, Suite 3500
> Boston, MA 02111
> Telephone: 617.217.4700
> Facsimile:  617.217.4710
> Matthew.Lindenbaum@nelsonmullins.com
>
> *Attorneys for Plaintiff Bitmain Technologies*
> *Georgia Limited*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss and Compel Arbitration was filed with the Court using the CM/ECF system on July 17, 2024, which provided notification of filing to the following counsel for Defendant JWKJ Technologies LLC:

Rachel M. Milazzo
Jacob W. Thessen
Dentons US LLP
One Metropolitan Square
211 N. Broadway, Suite 3000
St. Louis, MO 63102
rachel.milazzo@dentons.com
jacob.thessen@dentons.com

*/s/ Christopher S. Shank*
Attorney for Plaintiff

11