1

```
1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF MISSOURI
2                       EASTERN DIVISION

3

4    BITMAIN TECHNOLOGIES          )
     GEORGIA LIMITED,              )
5                                  )
          Plaintiff,               )
6                                  )
          v.                       )No. 4:24-CV-00927 HEA
7                                  )
     JWKJ TECHNOLOGIES LLC,        )
8                                  )
          Defendant.               )
9

10              TEMPORARY RESTRAINING ORDER HEARING

11            BEFORE THE HONORABLE HENRY E. AUTREY
                 UNITED STATES DISTRICT JUDGE
12
                        JULY 15, 2024
13

14   APPEARANCES:
     For Plaintiff:         Christopher S. Shank, Esq.
15                          SHANK AND HEINEMANN LLC
                            1968 Shawnee Mission Parkway, Suite 100
16                          Mission Woods, KS  66205

17                          Matthew Lindenbaum, Esq.
                            NELSON MULLINS LLP - Boston
18                          One Financial Center, Suite 3500
                            Boston, MA  02111
19
     For Defendant:         Rachel M. Milazzo, Esq.
20                          Jacob William Thessen, Esq.
                            DENTONS US LLP - St. Louis
21                          101 S. Hanley, Suite 600
                            St. Louis, MO  63105
22
     REPORTED BY:           ANGELA K. DALEY, CSR, RMR, FCRR, CRR
23                          Official Court Reporter
                            United States District Court
24                          111 South Tenth Street, Third Floor
                            St. Louis, MO  63102
25                          (314) 244-7978
        PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION
```

Exhibit 1

2

1          **(PROCEEDINGS STARTED AT 10:45 A.M.)**

2          THE COURT:  Good morning, all.  This is the matter of

3  Bitmain Technologies Georgia Limited, plaintiff, versus JWKJ

4  Technologies LLC, case number 4:24-CV-00927.  This matter is

5  now before the Court for purposes of proceeding on a hearing

6  for equitable relief.  Plaintiffs are present through counsel;

7  defendants are present through counsel.

8          Are the parties ready to proceed?

9          MR. SHANK:  Yes, Your Honor.

10          MS. MILAZZO:  Yes, Your Honor.

11          THE COURT:  All right.  Let us proceed.

12          MS. MILAZZO:  Your Honor, if I may before we begin.

13          THE COURT:  Yes.

14          MS. MILAZZO:  Defendants did file a motion to dismiss

15  and compel arbitration this morning, and we would like to ask

16  the Court to entertain hearing that before we get into any

17  merits-based arguments on the TRO motion.

18          THE COURT:  Well, are you good with that?  I haven't

19  read it because it was just filed this morning and I just

20  realized that it was filed myself, so go ahead.

21          MR. SHANK:  Yeah, Your Honor, Christopher Shank here

22  on behalf of plaintiffs.  We just read it and we are not

23  prepared to deal with that this morning.  We don't think it's

24  relevant to the issues that we are going to be presenting to

25  the Court.  We also have our Court-mandated response time that

3

1   we would like to take advantage of, so we don't think it's

2   appropriate to deal with the motion to dismiss now because we

3   are before you with I think a very important matter of

4   equitable and urgent relief that we are requesting.

5            My name is Christopher Shank.  I am here on behalf of

6   the plaintiff, and I am with the Shank and Heinemann law firm

7   in Kansas City.  The principal speaker today will be my

8   co-counsel Matthew Lindenbaum with the Nelson Mullins law

9   firm, so I am going to turn it over to him with the Court's

10  permission.

11           THE COURT:  All right.

12           MR. SHANK:  Thank you.

13           THE COURT:  Anything in response?

14           MS. MILAZZO:  Yes, Your Honor.  Our motion to dismiss

15  and to compel arbitration goes directly to the Court's ability

16  to even hear this TRO.  The basis of the argument in our

17  motion to dismiss and to compel arbitration is that all claims

18  including any requests for injunctive relief is under

19  mandatory arbitration pursuant to Section 16.4 of the parties'

20  negotiated Agreement and, therefore, this case is not properly

21  before this Court and this Court is not the proper forum to

22  hear the TRO and that the AAA which is the jurisdiction that

23  was selected by the parties permits interim relief, injunctive

24  relief, and emergency relief, and that, therefore, this is not

25  the proper forum so we should not be proceeding with this TRO

4

1    today.

2           THE COURT:  So let me ask you this.  When did you

3    become aware of this proceeding?

4           MS. MILAZZO:  On Monday.  And when I spoke to --

5           THE COURT:  Monday a week ago?

6           MS. MILAZZO:  Correct, yes, Your Honor, and I spoke

7    to --

8           THE COURT:  And when did you conclude that there

9    might be a basis for a motion to dismiss after learning about

10   this proceeding?  And when I say learning about this

11   proceeding, I mean not knowing that -- not just knowing that

12   it was pending but having reviewed whatever had been filed

13   that was pertinent to the proceeding.

14          MS. MILAZZO:  So to give the full background, on

15   Monday evening, I was e-mailed the pleadings.  I immediately

16   asked for a phone call with opposing counsel.  I spoke to

17   opposing counsel on Tuesday, and I said to opposing counsel

18   that I do not believe this is the correct forum, that I think

19   this should be dismissed, it should be sent to arbitration

20   under Section 16.4.  Opposing counsel and I then had a

21   discussion that we were going to try to settle where I agreed

22   to go back to my client and see if I could resolve this

23   dispute because I just got brought in.  I went back to my

24   client who is located in China, by the way, Your Honor, so

25   there is like a 12-hour difference between, you know, when I'm

5

1  awake and when he's awake -- or I should say there is a

2  12-hour difference in the time.

3         THE COURT:  Right.

4         MS. MILAZZO:  So we were working to try to figure out

5  a settlement.  I made an offer.  There was a counter.  There

6  was back-and-forth, and during this entire time, Your Honor,

7  we were researching and figuring out, well, if we have to go

8  forward on Monday, we should prepare, but we were unable to

9  reach a settlement on Friday and then we finished up over the

10 weekend.  Our docket is not available over the weekend.  I did

11 e-mail them over the weekend to talk to them about the filing,

12 and they filed first thing this morning at I believe 7:00 a.m.

13 Central.

14        THE COURT:  What's not available over the weekend?

15        MS. MILAZZO:  Dentons docketing who -- like attorneys

16 don't file on PACER.  Our docketing team handles the filings

17 for the attorneys.  That's just the system that the firm has

18 in place.  Regardless, we were still working on -- Your Honor,

19 we were still working on the memorandum and motion over the

20 weekend most certainly.

21        THE COURT:  This is merely an editorial comment.

22        MS. MILAZZO:  Yes, Your Honor.

23        THE COURT:  But that seems a little problematic when

24 a lawyer prepares something that's important that needs to be

25 filed in court that the lawyer can't do it him or herself,

6

1   some docketing team has to do it.  But, you know, I do this

2   every day, so I don't know anything about that.  Whatever I

3   file, I file myself.  I don't have a docketing team to file

4   stuff for me so my perspective is a little different in that

5   regard, but I do think it's problematic.

6        So, you know, here's what I think.  I think that

7   traditionally if a lawyer regardless of whether they were a

8   sole practitioner or if they're in a firm, large, small, huge,

9   feels that there is a legitimate basis for a particular

10  motion, particularly a dispositive motion such as a motion to

11  dismiss, that the lawyer or lawyers would be aggressively

12  pursuing that, especially in a situation like this where time

13  is of the essence -- it's a short turn-around time -- such

14  that the matter can be filed, briefed, responded, and fully

15  discussed.  The fact that you just filed it this morning puts

16  everybody, well, at the short end of the stick.  I didn't know

17  that it was filed until my JA and my law clerk told me before

18  we came out, and they just happened to realize that it was

19  filed because, well, it was kind of late filed.  When I say

20  late filed, it was filed the morning of the hearing.

21        So, you know, the Court -- that would be me -- is at

22  a disadvantage to know exactly what the nature of the motion

23  is and to at least have some idea upon a cursory review as to

24  whether there may be any merit to it or not because that's

25  what we do.  You know, we get something, we read it, and based

7

1    upon what we know if that's already been filed, we go, yeah,

2    you know, there might be something to this or yeah, you know,

3    maybe there isn't something to that, and then we wait and see

4    what the opposition says to make the "final call" -- that's in

5    the lower case with quotes before and after -- and then we

6    have a hearing to find out, well, is there something that the

7    movant can say or argue or the opponent can say or argue that

8    can highlight the legitimacy or lack thereof of the motion.

9    We can't do that here because you just filed it this morning,

10   the morning of the hearing.

11           Now, there are two ways to do it.  I mean, we

12   actually could have a hearing, which really wouldn't mean so

13   much because, well, you know more than anybody else about the

14   motion because it's your motion, right?  Or we could postpone

15   it if we operate from the perspective of, well, you know,

16   looking at in the light most favorable to the likelihood that

17   there might be some considerable merit to it that we should

18   take the opportunity to hear this thing, give everybody an

19   opportunity to get up to speed, and then hear it before going

20   into the merits of the TRO because, as you say, if your motion

21   is meritorious, then that obviates the necessity for a hearing

22   on the TRO because, well, things get kicked.  That sort of

23   flies in the face of the significance and the heightened state

24   of TRO injunctive relief matters being an equitable proceeding

25   and the need to engage in the type of an emergency hearing.

8

1    Here's the other thing.  I can't speak for my

2    colleagues because I am not sitting on their bench.  I sit on

3    my bench here in the Eastern District of Missouri and no place

4    else in this little room, and I have to say, sadly, I see

5    lawyers doing this more than I would like it to be done where

6    on the day of a significant hearing, a motion to dismiss

7    magically appears.  Now, I'm not casting aspersions.  I am

8    looking at it from the perspective of, oh, I guess things do

9    just kind of happen that way, but because it happens so

10   frequently, it causes me concern.  And there is always some

11   rationale given for the late filing that could interfere with

12   hearing the substance of the case and cause a delay.  Our

13   system is not supposed to be about delay.  Our system is

14   supposed to be about, well, expeditiously but fairly moving on

15   things that come before us as lawyers and as judges, okay?

16   However, as we all have noted, there are those who, well,

17   would like to make the system one of delay because in

18   delaying, there is advantage to delay for the person, the

19   entity, who is attempting to delay the proceedings.

20          Having said that, we are going to argue the motion.

21   They will have the opportunity to -- I mean, the motion for

22   the equitable relief.  They will have an opportunity to

23   appropriately respond to your motion to dismiss.  Whatever

24   happens today in relation to the argument on the substance

25   will be taken under submission, all right?  You can file,

9

1   respond.  If there is a need for an argument, then we will,

2   but I'm suspecting that it can be ruled on the papers and then

3   we'll go from there, okay?

4          MS. MILAZZO:  Yes, Your Honor.

5          MR. SHANK:  Thank you, Your Honor.  With that, I will

6   turn it over to my co- counsel, Mr. Lindenbaum.

7          THE COURT:  Thank you, sir.  Proceed, sir.

8          MR. LINDENBAUM:  Good morning, Your Honor, Matthew

9   Lindenbaum from Nelson Mullins for Bitmain.  Your Honor, we

10  are here this morning because JWKJ, the defendant, is holding

11  my client's property hostage.  It has stolen my client's

12  property.  My client is Bitmain, and it is using that property

13  to exert leverage in a dispute between the parties over

14  invoices.

15         Now, the background here is that Bitmain and JWKJ

16  entered into an Agreement, the Service Framework Agreement.

17  Under that Agreement, JWKJ was to provide my client with a

18  site to house 6,000 Bitcoin miners and would provide power,

19  you know, electricity, and internet and other services to

20  allow my client to mine Bitcoin using those 6,000 Bitcoin

21  miners at the facility.  That was the simple contract.  Yes,

22  Your Honor?

23         THE COURT:  So how does one mine Bitcoin?

24         MR. LINDENBAUM:  Let me actually show you, this is

25  just a picture that I think will be helpful.  I have a number

1    of copies.  So, Your Honor, what these pictures show are a

2    number of Bitcoin miners like in situ there.  Each one is a

3    computer, like a CP, and you can see them kind of stacked

4    together, but it's a specialized one.  It's been optimized to

5    instead of doing the things that computers normally do, all

6    the time it is attempting to mine Bitcoin.  Now, the way one

7    mines Bitcoin is through cryptographical methods.  Computers

8    try to basically crack the code to identify blocks of Bitcoin.

9    Every time a block of Bitcoin is found through this process,

10   the person mining it or the entity mining it gets that block

11   of Bitcoin.  It's a lucrative business, Your Honor, because

12   currently a block of Bitcoin can go for a few hundred thousand

13   dollars because it's several Bitcoin and each Bitcoin right

14   now is about 60 to $70,000 each.  There is a finite amount of

15   Bitcoin in the internet, and it's a zero sum game for mining

16   it.  The more computers, the more Bitcoin miners you have

17   mining Bitcoin, the more likely you are to discover it.

18           So Bitcoin miners, these computers, are the tools

19   needed to mine just like you'd have tools to mine gold or coal

20   or anything else.  They are highly sophisticated, they are

21   proprietary.  My client actually in addition to using them

22   manufactures them, and the more you have, the more successful

23   they are able to be.  They need power to run, and that's kind

24   of the heart of the original dispute here, Your Honor, which

25   is that JWKJ was supposed to provide sufficient power to my

11

1    client to allow it to mine Bitcoin, but it didn't, and so from

2    the beginning of this contract, there were disputes between

3    the parties over you are not providing us enough power, we

4    can't do what we're supposed to do.  We removed about half of

5    the Bitcoin miners, about 3,000 of them, from the site to see

6    if JWKJ could provide power at the lower amount for the lower

7    number.  They couldn't do that, and thus we had the dispute

8    over the invoices because they are invoicing us for power, and

9    our position was you haven't provided us that power.  That was

10   the dispute.

11            So what happened next, Your Honor --

12            THE COURT:  And so that the record is clear, when you

13   say power?

14            MR. LINDENBAUM:  Electricity.

15            THE COURT:  Thank you.

16            MR. LINDENBAUM:  Thank you.  So what happened next

17   was JWKJ barred my client from this data site where it was

18   hosting the Bit miners, would not let us in there even though

19   we have the right to be in there because it's our property,

20   and then to make matters worse and in particularly egregious

21   fashion, JWKJ went to the Bit miners and reprogrammed them to

22   mine Bitcoin not for us, the rightful owners, but for

23   themselves.  So one of my colleagues used this analogy.  Not

24   only do they have our chickens, Your Honor, they also are

25   stealing our eggs.  They have taken the Bit miners and now

12

1   they are using the Bit miners to mine Bitcoin for themselves.

2   They have no right to do this under the Agreement or under

3   basic notions of property law.  This is our property, which

4   they have stolen.

5           So we sent a termination letter.  This is back last

6   month.  We had asked, let us come in and take our property, it

7   is ours, and they refused to do that.  They claim that we have

8   not properly terminated the Agreement, and we can debate that.

9   I don't think we need to debate it here.  We think that we

10  have, but the point is is that nothing in the Agreement allows

11  JWKJ to hold our property hostage.  Nothing in there allows

12  them to steal it, and that is what they have done.  That's why

13  we have come to the Court, Your Honor.  That's why we are here

14  seeking injunctive relief.

15          The dispute over invoices -- and we'll get to this in

16  our opposition to the motion to dismiss in due course.  The

17  dispute over invoices we agree should be decided in AAA

18  arbitration, and we look forward to doing that.  The problem

19  here is that JWKJ has stolen our property in the meantime.

20  That's not a contract dispute or anything else, that's theft,

21  and we need the Court's assistance here to get our property

22  back.

23          So JWKJ has refused to allow Bitmain, my client, to

24  remove the miners.  Look, we disagree with the contention that

25  we have underpaid invoices, but even if we had, that does not

13

1   give them the right to take our property.  Theft is not, you

2   know, is not a self-help remedy under the law, you know, and

3   even if JWKJ is right that we terminated in some improper

4   manner and that the Agreement is still active, that does not

5   give them the right to hold our property hostage.  We own

6   these miners.  We can do with them as we please, and what we

7   want to do is to remove them from this JWKJ data site and take

8   them out so we can use our property.  Every day that we don't

9   have our miners, they are sitting there doing nothing because

10  not only is JWKJ not providing us with power, they are using

11  the miners to mine Bitcoin for themselves.

12          So I want to take one step back, Your Honor, just to

13  point to a relevant portion of the Service Framework

14  Agreement, which I think kind of solves everything here today.

15  This is Article 8.1.  Now Article 8.1 says, quote, Service

16  provider -- and that's JWKJ -- acknowledges and agrees that

17  the hosted servers -- those are the Bitcoin miners -- are

18  assets of Bitmain -- that's my client.  The SFA continues to

19  note, quote, The owner of the hosted servers shall solely have

20  the proprietary interest in the hosted servers.  That means,

21  Your Honor, in addition to the fact that this is our property,

22  JWKJ has agreed in writing in the Agreement that this is our

23  property, these miners.  There is no argument before you nor

24  can there be that anyone owns these Bit miners other than

25  Bitmain, and by holding the Bit miners for itself and by using

14

1   the Bit miners to mine Bitcoin for itself, JWKJ is holding our

2   property hostage and using it to mine Bitcoin for itself,

3   which is denying us the fruits of our property beyond

4   everything else.

5           I would like to note another provision of the Service

6   Framework Agreement.  This is Article 13.1 which holds that

7   Bitmain will suffer irreparable harm if the Court does not

8   grant the injunctive relief that we seek.  It states, Service

9   provider -- that's JWKJ -- acknowledges that a breach or a

10  threatened breach of this Agreement shall cause serious and

11  irreparable harm to Bitmain for which monetary damages alone

12  would not be a sufficient remedy.  Service provider -- again

13  that's JWKJ -- hereby waives any claim or defense that damages

14  may be adequate or ascertainable or otherwise preclude

15  injunctive relief.  This shows, Your Honor, that the parties

16  anticipated that in a situation like this, injunctive relief

17  was the only relief that could make us whole.

18          Not only that, but we have real concerns, Your Honor,

19  that if this relief is not granted, that we may never see

20  these miners ever again.  Now, the miners themselves -- and

21  this is 3,407 of these devices, Your Honor -- they are worth

22  approximately $15 million.  They also allow us to mine on

23  average about $30,000 of Bitcoin a day.  So every day we don't

24  have them, we are losing that and JWKJ is stealing it.  The

25  longer that this goes on, the less likely -- the more our

15

1  damages increase.

2        And while these are monetary damages, JWKJ has

3  already indicated to us in the course of this invoice dispute

4  that they don't think that they have the money to cover the

5  dispute over invoices.  The dispute over invoices is in the

6  hundreds of thousands, maybe a million or so dollars, so in a

7  dispute of that magnitude, they have stolen $15 million worth

8  of our property, so we are very concerned that without the

9  order allowing us to go in and remove these miners and

10 preventing JWKJ from stopping us, we are not going to see our

11 property again.

12        Not only that, but the Bit miners themselves, Your

13 Honor, the servers, they are proprietary.  We manufacture

14 them.  They have intellectual property, trade secrets within

15 them.  While JWKJ is holding them without right, they could be

16 taking them apart, reverse-engineering them, doing whatever to

17 steal our IP on top of that, and that's a level of damages

18 that can't be calculated.  These devices, they are highly

19 sophisticated.  This is not just, you know, a regular

20 computer.  To use another analogy, Your Honor, in some

21 respects JWKJ is like the landlord here and we are the tenant

22 and we have a dispute with the landlord over, you know, rent,

23 and the landlord in response to that has kicked us out of our

24 apartment and is holding all of our furniture, clothes,

25 computers, everything else except -- now while that would be

1   ridiculous and no one would allow that under the law and we

2   need our stuff back, here it's not run-of-the-mill stuff.

3   It's highly sophisticated computers that, you know, do this

4   highly sophisticated commercial mining operation.  So we are

5   losing tremendously while it is allowed to continue.

6           Your Honor, while we are not arguing the motion to

7   dismiss, which we just received this morning, I would like to

8   note a few things about it.  One, like I said, the core

9   dispute between the parties here is over invoices.  That

10  dispute can be resolved at AAA arbitration.  The issue that we

11  have here is that separate and apart from that dispute, JWKJ

12  is holding our property hostage.  They have stolen it and they

13  are using it to continue to steal from us.  These Bit miners

14  are our property, and a ruling that they're our property

15  allowing us to go in and take them will not impact the core

16  dispute between the parties whatsoever.  All it allows us to

17  do is to go in and get our property and to stop the theft from

18  us.

19          So your making a decision on our request for

20  injunctive relief will not interfere with the core dispute

21  which is one of the points that they raised in their briefing,

22  and that's clear under Eighth Circuit claw.  If the Court can

23  decide the injunctive relief and does not have to go to the

24  core dispute, then it can absolutely do so.  Here that is

25  absolutely the case.  There is no argument from JWKJ nor can

17

1   there be that they have any ownership interest in these Bit

2   miners.  They have simply stolen them and have used it to mine

3   Bitcoin for itself.  So with no real dispute over the

4   ownership, Your Honor, what we think the Court should do is

5   allow us to go in and take our property, then we would be

6   happy to go with JWKJ and either through stipulation or motion

7   stay or dismiss this action here and go and litigate the

8   invoice dispute in AAA.  We just need our stuff back and not

9   allow them to hold onto it.

10          I'll note, too, at a quick review of the brief that

11  was filed, the cases that are cited, many of which are not

12  reported, they are distinguishable.  They are not cases where

13  as we have here, there is a specific provision in the SFA that

14  carves out injunctive relief.  Section 16 of the SFA carves

15  out injunctive relief and JWKJ has said, well, AAA rules allow

16  for injunctive relief.  Well, true, they do, but if that's the

17  case, then why do we have a specific carve-out for injunctive

18  relief here.  That would not be necessary if we were relying

19  on AAA injunctive relief.  Not only that, but Section 13.1 of

20  the Agreement also says that an injunction is the only way

21  that we can be made whole, and that's something that JWKJ has

22  agreed to.

23          So, Your Honor, I think it's clear, our property are

24  these 3,407 Bit miners.  They have been stolen.  They are

25  being used to take -- they are being used for JWKJ's benefit

18

1   when it has no ownership interest to it, where they have

2   agreed they have no ownership interest to it.  What we'd ask

3   respectfully the Court to do is to issue the order, allow us

4   to go reclaim our property, then we will take this dispute to

5   AAA just as they have asked for in the motion to dismiss, but

6   it won't be with them holding our property hostage and using

7   it to cause us ongoing damage.

8           Happy to answer any other questions and would

9   appreciate the opportunity to respond to any points raised by

10  JWKJ.

11          THE COURT:  Just one.

12          MR. LINDENBAUM:  Yes.

13          THE COURT:  I think you said, correct me if I'm

14  wrong, earlier that they had re-programmed or converted the

15  miners to their own use and were mining the Bitcoin for

16  themselves; is that correct?

17          MR. LINDENBAUM:  That is correct, Your Honor.

18          THE COURT:  And you know that how?

19          MR. LINDENBAUM:  So Bitmain was able to through its,

20  you know, study of the Bit miners determined that.  So number

21  one, our wallet where the Bitcoin would be mined and was

22  supposed to go was not receiving mined Bitcoin while the Bit

23  miners were running with power at the facility.  So that was

24  taking place.  I don't think that JWKJ even disputes that; at

25  least in our conversations they have not.  So they have

19

1   acknowledged that they are holding our property hostage and

2   they are using it to mine the Bitcoin.  I think they see it as

3   a way of mitigating damages in our invoice dispute except you

4   can't steal to mitigate damages.

5         THE COURT:  All right.  Thank you.

6         MR. LINDENBAUM:  Thank you.

7         THE COURT:  Response.

8         MS. MILAZZO:  So, Your Honor, I will be the first to

9   admit that there are legitimate concerns with the allegations

10  in plaintiff's complaint, and when my law firm -- specifically

11  myself -- was brought into this dispute, things have changed.

12  And I will get to the legal argument, but I do think it's

13  important to provide some context and background that once I

14  got involved as of last week, I did communicate in writing

15  that they were permitted to come to the property and access

16  and take inventory of the machines.  The client is no longer

17  mining, and I should note the client has not sold anything

18  that it has mined.  It is holding it but has not sold or

19  disposed of anything, and they have stopped doing that on my

20  advice.  They have agreed to permit them immediate access on

21  my advice.

22        And basically the request that we have is to keep the

23  status quo, and I will get into the legal arguments, but I do

24  think it's important to point out that since the time of

25  filing and my law firm's involvement, that that advice has

20

1   been directed to the client and the client has accepted that

2   advice, and as of right now, they are free to come, take

3   inventory, inspect, count, do whatever they want with their

4   machines.  I provided that in writing that they could come at

5   3:00 on Friday or coordinate a time with me.  So that

6   agreement has been made and that agreement stands, Your Honor.

7          So essentially on a little bit more of the background

8   information, the crux of our argument is that the Agreement

9   was not properly terminated, and the reason why that matters

10  and why we are asking for the status quo to remain in place at

11  least for the time being is that when there is a termination

12  for convenience under the Agreement -- which is what I know

13  they disagree with us on, but our position is that this was a

14  termination for convenience -- that we're required to get 60

15  days' advanced written notice before the Agreement terminates.

16  So our position is, the earliest possible the Agreement could

17  terminate would be August 18th because written communication

18  notifying us of their intent to terminate was provided on

19  June 18th, and under the contract, they are permitted to come

20  in and remove all of their equipment on the 60-day mark after

21  they give notice of termination.

22          Now I will admit they don't agree with us.  They

23  think they properly terminated.  Our position is they did not.

24  There was a force majeure event and there was a provision in

25  the contract that addresses that that says if there is a force

1 majeure event that causes issues with the provision of the

2 electricity for the transformers which they have said that we

3 failed to provide, that if there is a force majeure event and

4 we give notice, then we kind of get like a blessing period to

5 get it fixed.  So our position is there was an inclement

6 weather event in February that caused power issues and that it

7 took us several months to get the actual transformer to

8 replace it, and we provided written notice to them, and during

9 that time period, it's important to note that they didn't

10 terminate.  It wasn't like during February, March, April, May

11 they sent us some letter saying we understand there is a force

12 majeure event, but we're giving you our notice.  Like they

13 provided their notice of termination on June I believe it was

14 18th or 19th, and so our position is the Agreement isn't

15 terminated.  Like you shouldn't be coming in and removing all

16 of the equipment when the Agreement is still in place for the

17 60-day period.

18          Now, the reason why this is important, we have

19 contractual obligations.  They are a sub tenant, we're the

20 tenant, and then there is a landlord.  So there is the

21 landlord and then we're a sub tenant and they're a sub sub

22 tenant.  We have obligations to our landlord to pay a certain

23 amount of money, which is also, you know, outlined.  There is

24 information outlining the electricity and the anticipated

25 charges in the Agreement with Bitmain as well.  But we have

22

1    obligations to pay a certain amount to our landlord based on

2    this business operating, which is why it is important that

3    they abide by the rules of giving us the 60 days' notice

4    because we have to pay our landlord regardless.  So if they

5    are terminating early and removing all the machines, then that

6    basically breaches our deal because the deal, the Agreement,

7    says they can remove them after it's terminated, but our

8    position is it hasn't been effectively terminated.

9          So I understand that there is an issue of fact on

10   that, but that is the position that we're taking.  We are not

11   saying you can't ever take these machines and we're not saying

12   you can't come today and check to see that we haven't broken

13   them, we haven't sold them, we haven't damaged them.  They are

14   still there.  You can come take your inventory.  Section 6.7

15   of the Agreement outlines what they are permitted to do while

16   the Agreement is still in place, and none of it says you can

17   remove the machines.  It says you can come inspect them.  It

18   says you can maintain them.  It lists sub parts of all the

19   different things it can do while the Agreement is in place,

20   and 6.7 doesn't say anything about removing the machines while

21   the Agreement is still in place.

22          Another issue that's important just for the factual

23   context is that as plaintiff has noted, there is a substantial

24   disagreement over the amounts due.  The position that we have

25   is they owe well over a million dollars and they haven't paid

23

1    their rent and other damages.  And they are well aware that we

2    have to pay our landlord for the electrical consumption.  So

3    on top of the fact that they are trying to remove their

4    machines and terminate early, they are also sticking us with

5    the bill of over a million dollars in electrical fees that we

6    have incurred on their behalf for their benefit for them to

7    make money.

8         And so there is a little bit more to this story.  I

9    understand that that doesn't justify some of the activity.  I

10   have advised my client that much, but there is more to the

11   story behind why we are where we are than just what plaintiff

12   has presented.

13        Now, as for irreparable harm, which I think is really

14   the crux of the analysis here, the hosted servers have been at

15   defendant's facility for some time.  Plaintiff has asserted no

16   allegation that defendant is damaging, disposing of, harming

17   the machines.  They have speculated on that today, but that is

18   not in an affidavit.  There is no evidence to support that.  I

19   will submit to the Court that my client has advised that that

20   has not occurred, that the machines are still in place.  They

21   have not been damaged or sold.  And we submit to the Court

22   that this is all monetary, that monetary relief will suffice

23   here.  If we are offering them immediate access to the

24   property to take their inventory and we are offering them the

25   ability to inspect the machines, make sure they are there,

24

1    make sure they haven't been harmed, make sure that they

2    haven't been damaged, then all of this can be -- there could

3    be a reconciliation.

4            We're filing a counterclaim no matter whether it's

5    before the arbitrator or this Court for the million plus

6    dollars that we are due.  They can file a claim against us for

7    the Bitcoin they think that we are holding -- again, not

8    selling, but holding -- and a reconciliation could be done on

9    who owes what to whom after the reconciliation is performed on

10   the damages that we have incurred and the damages they have

11   incurred.  And I submit to the Court, both parties have likely

12   incurred damages in this contractual relationship.  So

13   plaintiff has monetary relief available, and ultimately

14   plaintiffs have an adequate remedy of law, and that's monetary

15   damages again because we have offered them access.  We are not

16   preventing them from going in and inspecting the machines.

17           Now, on evaluating the potential harm to defendants

18   should an injunction issue, as I noted, we have to continue

19   basically holding their costs.  In addition to the million

20   plus dollars they owe us on past due rent, we have to

21   continue -- if they are able to take these machines out, we

22   have to continue carrying their costs and incurring more and

23   more damages.  And again, if we are trying to enforce the

24   Agreement and enforce the status quo, the status quo is where

25   we are now with the machines there not being damaged, not

25

1  being sold, not being harmed until the Agreement is properly

2  terminated.

3          And on the probability of success on the merits, it

4  goes back to our improper termination argument, so I won't

5  re-tread there.

6          And then the public interest, of course, you know, we

7  think there is a public interest in not sticking your landlord

8  with a million plus dollar past due rent and forcing us to pay

9  the costs basically to run their business, Your Honor.  A

10 million plus dollars in past due rent, so we are effectively

11 paying for them to operate their business.  There is an equal

12 amount of harm that is going to be to us especially

13 considering we are not keeping them from coming to inspect

14 their machines.

15         So we are simply requesting that the status quo

16 remain in place, and we submit to the Court that plaintiffs in

17 this action have -- according to Eastern District of Missouri

18 authority, plaintiffs in this action bear a heavier burden

19 than normal because a temporary restraining order they are

20 seeking would disturb the status quo by taking what the

21 current situation is and changing it.  And also, Your Honor --

22 that's actually *Blankenship versus Chamberlain*, Eastern

23 District of Missouri.

24         So that's the gist of the situation.  As I said, I

25 understand this is problematic.  I am not going to try to say

26

1    it isn't, but that is the position that we have.

2         I do want to touch upon the motion because counsel

3    did raise it and make some argument.  I was not going to, Your

4    Honor, but --

5         THE COURT:  Go ahead.

6         MS. MILAZZO:  -- I do think that the door was opened.

7    I'm not going to take a lot of time, but the gist of the

8    argument is there is unquestionably a mandatory arbitration

9    provision, and I absolutely disagree with counsel that

10   injunctive relief is carved out.  Section 16.4 of the

11   Agreement states that "all disputes arising under the

12   Agreement should be submitted to arbitration in Houston before

13   the American Arbitration Association," and it goes on to say

14   "no party to this Agreement will challenge the jurisdiction or

15   venue provisions as provided in this section."  The only thing

16   it mentions about injunctive relief is "nothing contained

17   herein shall prevent a party from obtaining injunctive

18   relief."  AAA permits injunctive relief.  AAA is the forum

19   that was selected by the parties in their negotiated

20   Agreement.  Nothing in this dispute resolution provision

21   carves out the Eastern District of Missouri being able to hear

22   a TRO when, A, there is a mandatory arbitration provision for,

23   quote, all disputes, and secondarily, when the AAA has

24   expressed provisions.  Rules 38 and 39 allow them to get

25   emergency and immediate interim and injunctive relief.

27

1      And further, Your Honor, on top of that, I would like

2  to point out, and I understand they are not published cases,

3  but the *Kane* case, which was decided by Judge White, and the

4  *Diabetic Care* case decided by Judge Perry in the Eastern

5  District of Missouri touch upon this issue.  In both of those

6  cases, the Court decided to compel arbitration where

7  injunctive relief was being sought because they found that a

8  motion to dismiss was proper despite the fact that there was

9  injunctive relief requested based on -- again, I am trying to

10 keep it short, Your Honor -- based on all the authority we

11 have cited in our brief, which we cite multiple U.S. Supreme

12 Court cases, Eighth Circuit case law, and these cases from

13 Judge Perry and Judge White.  I call out the cases from Judge

14 Perry and Judge White, the *Kane* and *Diabetic Care* cases --

15 again Westlaw citations only available -- because they are the

16 most factually analogous, Your Honor, because they deal with a

17 motion to compel arbitration where injunctive relief is

18 involved.

19      Now, counsel said they are factually distinguishable.

20 I'm not saying they are on all fours as far as the facts, but

21 I mean it's very difficult to find a case exactly factually

22 analogous.  It's the concept here, Your Honor, of whether when

23 there is a mandatory arbitration provision and a dispute

24 resolution provision in an agreement, it is whether or not it

25 is appropriate to compel arbitration relative to injunctive

28

1   relief.  So for the purposes of the fact that those two cases

2   address that issue head-on and find in favor of dismissing the

3   action outright including the request for injunctive relief

4   and compelling arbitration, that is why I believe that they

5   are instructive to this Court.

6        So I won't belabor the point.  I understand that the

7   Court is going to take it under submission and review briefing

8   if necessary, but that is essentially defendant's position

9   that ultimately this has to be decided by AAA.

10        THE COURT:  All right.  Thank you.  Any response?

11        MR. LINDENBAUM:  Thank you, Your Honor.  Your Honor,

12   just a few quick points.  As you heard a moment ago,

13   Ms. Milazzo did admit that her client has been stealing the

14   Bitcoin from us, that they have been using our miners to mine

15   Bitcoin for itself.  What she says now is that having already

16   stolen from us, we should take their word for it that they

17   won't pending sending this to AAA or otherwise having already

18   stolen from us.  Your Honor, that's why we need to be here

19   today.  It's, you know, take our word for it that we won't

20   steal again, that we won't damage your Bit miners, that we

21   won't use them to mine Bitcoin or to try to reverse-engineer

22   them.  So again, we are in a situation where the other side

23   has admitted that they have stolen our property and they ask

24   us to just, you know, trust them that they won't again.

25        Now, not only that, but I think both parties agree

29

1   and you didn't hear anything otherwise from Ms. Milazzo that

2   this property, the Bit miners, is owned by Bitmain.  That's

3   undisputed.  It's our stuff.  All that she said is that she

4   disagrees with how we terminated the Agreement.  And even

5   under her interpretation, all that means is that under her

6   view, we can go and remove the miners in a few more weeks

7   rather than now.  Now, we disagree with that, but, Your Honor,

8   what is clear is that this is our property, and nothing in the

9   Agreement requires us to keep the property there.  Just like

10  in a lease agreement or anything else, our property is ours

11  and we have the right to go and remove it, and that is the

12  only thing that we have asked the Court for.

13       This notion that they have a dispute with the power

14  company over power, that has nothing to do with us, and that

15  doesn't excuse their theft actions here.  Again, we will

16  litigate the invoice issues with them in AAA.  All we need is

17  what I think everyone agrees to here which is that this is our

18  property and we need to be able to go in and get it.

19       Now, Ms. Milazzo says that her client was willing to

20  let us go and take inventory of it.  That came in at the end

21  of last week where we were told at a certain time, we could go

22  in and do that, but frankly that's not sufficient.  It's not

23  enough for us to lay eyes on our property or to inventory it.

24  We need it back.  We own it, they don't have any right to it,

25  and the fact that we could look at it at one occasion doesn't

30

1    mean that they are not going to start stealing from us again

2    or to damage it, sell it, or do anything like that.  So that's

3    why, you know, we need to have an order allowing us to go and

4    take our property, which they have acknowledged holding

5    without right and which they have acknowledged using to steal

6    from us.  And again, nothing in the Agreement prohibits that.

7    It's our property.

8            And the Agreement itself carves out injunctive relief

9    explicitly.  The AAA rules do allow for injunctive relief, but

10   if that's the case, then we would not require the specific

11   carve-out that we can go get injunctive relief which is in two

12   different sections of the Agreement, 16 and 13.  So this will

13   preserve the status quo, Your Honor.  It would allow us to

14   have our property and then we can go and litigate with JWKJ

15   regarding invoice amounts in AAA, and we'd be supportive of

16   dismissing the action at that point.

17           THE COURT:  Question.

18           MR. LINDENBAUM:  Yes.

19           THE COURT:  Ms. Milazzo referenced arbitration as a

20   vehicle to seek injunctive relief.  Why not?

21           MR. LINDENBAUM:  I'm sorry?

22           THE COURT:  Why not?

23           MR. LINDENBAUM:  Why not use AAA to seek injunctive

24   relief?

25           THE COURT:  Uh-huh.

1      MR. LINDENBAUM:  It's not as fast as the Court here.

2  AAA takes awhile to get up and running, and that's why the

3  Agreement does carve-out injunctive relief.  If by saying that

4  nothing in here shall prevent Bitmain from getting injunctive

5  relief, that would be utter surplusage if it didn't mean we

6  could go to court because we could just go to AAA like it

7  says.  You know, you have AAA.  That's why it's carved-out,

8  and that's why every provision in this Agreement says this is

9  the property of Bitmain, Bitmain can use injunctive relief if

10  it needs to.  It's the only thing that can make it whole.  And

11  again, Ms. Milazzo doesn't even dispute that.  She just says,

12  you know, take it away in a few more weeks.  We want our

13  property now and we are entitled to it now.

14      THE COURT:  All right.  Thank you.  So as noted early

15  on, the motion for equitable relief will be taken under

16  submission.  With respect to the defendant's motion to dismiss

17  and compel arbitration, which was filed this morning, can you

18  guys get your response in in opposition by Wednesday?

19      MR. LINDENBAUM:  Yes.

20      THE COURT:  Before the close of business.

21      MR. LINDENBAUM:  With maybe a generous view of the

22  close of business, Your Honor.

23      THE COURT:  Yeah, that's a good point because in this

24  day of high-tech and basically being open 24 hours a day to

25  file.  5:00 old school time as opposed to digital high-tech

32

1   time?

2           MR. LINDENBAUM:  We will endeavor to do our best to

3   meet that deadline.  You know, it's less than 48 hours, but

4   we'll get right to it.

5           THE COURT:  If it becomes extraordinarily

6   problematic, contact my JA and let her know and we will go

7   from there.

8           MR. LINDENBAUM:  We will do that.

9           THE COURT:  Okay.  Good dealio?

10          MS. MILAZZO:  Yes, Your Honor.

11          THE COURT:  All right.  Thank you all so much, and

12  we'll go from here.

13          MS. MILAZZO:  Thank you, Your Honor.

14          MR. SHANK:  Thank you.

15          THE COURT:  Thank you so very much.

16          MR. LINDENBAUM:  Thank you.

17          THE COURT:  We will be in recess.

18              **(PROCEEDINGS CONCLUDED AT 11:30 A.M.)**

19

20

21

22

23

24

25

33

1                            CERTIFICATE

2

3        I, Angela K. Daley, Registered Merit Reporter and

4    Certified Realtime Reporter, hereby certify that I am a duly

5    appointed Official Court Reporter of the United States

6    District Court for the Eastern District of Missouri.

7        I further certify that the foregoing is a true and

8    accurate transcript of the proceedings held in the

9    above-entitled case and that said transcript is a true and

10   correct transcription of my stenographic notes.

11       I further certify that this transcript contains

12   pages 1 through 32 inclusive and that this reporter takes no

13   responsibility for missing or damaged pages of this transcript

14   when same transcript is copied by any party other than this

15   reporter.

16       Dated at St. Louis, Missouri, this 16th day of July,

17   2024.

18

19

20            /S/Angela K. Daley
              Angela K. Daley, CSR, RMR, FCRR, CRR
21            Official Court Reporter

22

23

24

25